SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

## Michael E. Hirsch v. Amper Financial Services, LLC (A-9-12) (070751)

**Argued May 13, 2013 -- Decided August 7, 2013**

**LaVECCHIA, J., writing for a unanimous Court.**

The issue in this appeal is whether it was proper to compel arbitration between a non-signatory and a signatory to a contract containing an arbitration clause on the basis that the parties and claims were sufficiently intertwined to warrant application of equitable estoppel.

This action involves claims by plaintiffs Michael Hirsch, Robyn Hirsch, and Hirsch, LLP, that they lost money invested in securities that were part of a "Ponzi" scheme. In 2002, plaintiffs' accountant, EisnerAmper LLP, referred them to Marc Scudillo, a financial advisor employed by Amper Financial Services, LLC (AFS), for investment planning. Scudillo also served as a representative for Securities America, Inc. (SAI), a separate corporation that served as a broker-dealer handling securities transactions. Plaintiffs hired Scudillo and invested in a portfolio with a conservative investment strategy. Their relationship was not formalized by a written contract. Later, on Scudillo's recommendation, plaintiffs purchase securitized notes from Medical Provider Financial Corporation (Med Cap) totaling $550,000. Plaintiffs signed two applications with SAI for the purchase of the Med Cap notes. Scudillo signed each of these agreements as the "registered representative" of SAI. Each SAI application contained an arbitration clause requiring disputes to be arbitrated by the Financial Industry Regulatory Authority (FINRA).

In 2008, one of the notes defaulted. Scudillo assured plaintiffs that the Med Cap investments were still safe. In 2009, the United States Securities and Exchange Commission launched an investigation and charged Med Cap senior officers with securities fraud. Plaintiffs eventually lost their investment in the Med Cap notes and filed two separate actions. First, they instituted FINRA arbitration proceedings against SAI and Scudillo, alleging breach of contract, fraud, breach of fiduciary duties, negligence, violations of federal and state securities laws, and conspiracy. Second, plaintiffs filed a complaint in the Law Division against EisnerAmper and AFS, alleging breach of contract, violations of the New Jersey Consumer Fraud Act, breach of fiduciary duties, negligent supervision, misrepresentation, violations of the New Jersey Uniform Securities Law, and malpractice.

In the Law Division action, AFS and EisnerAmper denied plaintiffs' allegations and filed a third-party complaint against SAI for indemnification and contribution. SAI moved to compel arbitration, arguing that (1) the language of the arbitration clause is sufficiently broad to cover the disputes with AFS and EisnerAmper; (2) AFS is a party to the arbitration clause because Scudillo, who served as a representative for both SAI and AFS, signed the arbitration agreement; (3) AFS and EisnerAmper are subject to the arbitration agreement under agency principles; and (4) AFS and EisnerAmper are subject to the arbitration agreement under the doctrine of equitable estoppel. AFS and EisnerAmper joined in SAI's motion. The trial court granted the motion, finding that plaintiffs were attempting to circumvent the policy favoring arbitration by not naming SAI as a defendant in the Law Division action.

The Appellate Division affirmed for different reasons. Relying on EPIX Holdings Corp. v. Marsh & McLennan Cos., Inc., 410 N.J. Super. 453 (App. Div. 2009), the panel concluded that the "complex and intertwined relationship" between the parties provides "sufficient basis to invoke estoppel" to compel arbitration. The Court granted plaintiffs' petition for certification. 212 N.J. 288 (2012).

**HELD**: Although traditional contract principles may in certain cases warrant compelling arbitration absent an arbitration clause, the intertwinement of the parties and claims in a dispute, viewed in isolation, is insufficient to warrant application of equitable estoppel to compel arbitration.

1. The strong preference to enforce arbitration agreements is not without limits. The preliminary question is whether, under state contract-law principles, there is a valid agreement to arbitrate. This arbitrability analysis underscores the fundamental principle that a party must agree to submit to arbitration. In the absence of an express arbitration clause, courts can compel parties to arbitrate by applying principles of contract law, such as equitable estoppel. (pp. 13-16)

2. In <u>EPIX Holdings</u>, the appellate panel held that a non-signatory to an arbitration agreement, which was the parent company of a signatory, may compel the other signatory to arbitrate because the claims and parties were "substantially connected" and the claims fell within the scope of the arbitration clause. Another case, <u>Angrisani v. Financial Technology Ventures, L.P.</u>, 402 <u>N.J. Super.</u> 138 (App. Div. 2008), involved claims against Nexxar Group, Inc., with whom the plaintiff had an employment contract containing an arbitration clause, and claims against Financial Technology Ventures, L.P. (FTV), from whom the plaintiff had purchased Nexxar stock pursuant to an agreement that did not include an arbitration clause. The panel concluded that the plaintiff could not be compelled to arbitrate his claims against FTV because he did not engage in any conduct that could support a finding of equitable estoppel. The panel noted that other cases applying equitable estoppel to compel arbitration generally involved claims against a non-signatory to the contract that was closely aligned to a contracting party, such as a parent or successor corporation. In this appeal, the panel's decision further reflects an emerging "intertwinement" theory-- described as an extension of equitable estoppel--that the Court now addresses and limits. (pp. 17-21)

3. Courts properly have recognized that arbitration may be compelled by a non-signatory on the basis of agency principles. That said, use of equitable estoppel as a basis to compel arbitration has limited applicability. Application of estoppel to compel arbitration based solely on the connection between the parties and claims overlooks that the parties are giving up their right to sue in court when they agree to use arbitration to resolve their disputes. The decision to compel arbitration in <u>EPIX Holdings</u> was appropriate given the agency relationship between the parent and subsidiary corporations in the litigation, not because of a theory of intertwinement. Equitable estoppel is invoked in the interests of justice and fairness. It does not apply absent proof that a party detrimentally relied on another party's conduct. (pp. 21-24)

4. In this case, the only arbitration clause is in the contract between plaintiffs and SAI. The clause mentions no other parties aside from Scudillo, who served as SAI's representative when executing the agreement. There is no express arbitration obligation with respect to AFS or EisnerAmper. Also, AFS and EisnerAmper did not have standing to compel arbitration under an agency relationship. Scudillo signed the contract as an agent of SAI, not as an agent of AFS or EisnerAmper. SAI shares no corporate ownership with AFS or EisnerAmper. Though plaintiffs' claims against defendants all arose out of the same alleged Ponzi scheme and the parties had some form of relationship with each other, that intertwinement of claims and parties alone is insufficient to warrant application of equitable estoppel. There is no evidence in the record that AFS or EisnerAmper expected to arbitrate their disputes in detrimental reliance on plaintiffs' conduct. The motion to compel arbitration should have been denied. (pp. 24-28)

The judgment of the Appellate Division is **REVERSED**, and the matter is **REMANDED** to the Law Division for further proceedings.

**CHIEF JUSTICE RABNER; JUSTICES ALBIN, HOENS, and PATTERSON; and JUDGES RODRÍGUEZ and CUFF (both temporarily assigned) join in JUSTICE LaVECCHIA's opinion.**

MICHAEL E. HIRSCH, ROBYN J.
HIRSCH, and HIRSCH, LLP,

    Plaintiffs-Appellants,

        v.

AMPER FINANCIAL SERVICES,
LLC, and EISNERAMPER, LLP
(f/k/a AMPER, POLITIZNER &
MATTIA, LLP),

    Defendants/Third-Party
    Plaintiffs-Respondents,

        v.

SECURITIES AMERICA, INC.,

    Third-Party Defendant-
    Respondent.

        Argued May 13, 2013 – Decided August 7, 2013

        On certification to the Superior Court,
        Appellate Division.

        Joel N. Kreizman argued the cause for
        appellants (Scarinci & Hollenbeck,
        attorneys).

        Denis C. Dice, a member of the Pennsylvania
        bar, argued the cause for respondent
        (Marshall, Dennehey, Warner, Coleman &
        Goggin, attorneys; Joel M. Wertman, on the
        brief).

        Craig S. Hilliard on behalf of respondents
        Amper Financial Services, LLC and
        EisnerAmper, LLP join in the brief by

respondent Securities America, Inc. (<u>Stark &
Stark</u>, attorneys).

JUSTICE LaVECCHIA delivered the opinion of the Court.

Commercial arbitration has developed as a popular method of dispute resolution for complex business relationships.  Parties to a contract can customize an arbitration to handle particular types of business transactions, including adopting their own procedural rules, selecting the substantive law applicable to the dispute, and appointing arbitrators with specialized expertise.  Additionally, parties can take solace in knowing that the arbitral award likely will be confirmed and enforced in light of the deference for arbitration's finality.  For those reasons, arbitration can be a cost-effective and speedy method of resolving litigation.

However, because parties must waive their right to pursue claims in state or federal court, there ordinarily must be an agreement to arbitrate.  Typically, parties reach an agreement by including an arbitration clause in a contract, which provides evidence to a court that the parties agreed to arbitrate disputes.  A court then can determine whether a particular claim falls within the scope of the arbitration clause.

In this case, the trial court granted a motion to compel arbitration between a non-signatory and a signatory to a contract containing an arbitration clause.  Even though the

2

signatory had not expressly agreed to arbitrate any disputes with the non-signatory, the court found that the parties and claims were sufficiently intertwined to warrant application of equitable estoppel. The Appellate Division affirmed.

We now reverse and hold that the trial court should have denied the motion to compel arbitration. Commercial arbitration is a creature of contract. Although traditional principles of contract may in certain cases warrant compelling arbitration absent an arbitration clause, the intertwinement of the parties and claims in a dispute, viewed in isolation, is insufficient to warrant application of equitable estoppel.

Equitable estoppel should be used sparingly to compel arbitration. It is a theory "designed to prevent injustice by not permitting a party to repudiate a course of action on which another party has relied to his detriment." Knorr v. Smeal, 178 N.J. 169, 178 (2003). Equitable estoppel is more properly viewed as a shield to prevent injustice rather than a sword to compel arbitration.

I.

A.

Michael Hirsch, Robyn Hirsch, and Hirsch, LLP (collectively plaintiffs) lost a significant sum of money invested in

3

securities that allegedly were part of a "Ponzi" scheme.[1] Plaintiffs filed suit against various parties involved in the purchase of the securities:  Securities America, Inc. (SAI), Marc Scudillo, Amper Financial Services, LLC (AFS), and EisnerAmper, LLP.

Scudillo was employed as a financial advisor by AFS, a financial services firm associated with EisnerAmper, an accounting firm.[2]  EisnerAmper often referred clients to AFS for wealth planning services.  Scudillo, who maintained brokerage licenses, was responsible for advising clients on issues such as asset allocation, retirement planning, and insurance.

Meanwhile, Scudillo also served as a representative for SAI, a separate corporation that served as a broker-dealer handling securities transactions.  According to plaintiffs, Scudillo was compensated by SAI as a salesperson for promoting certain financial products.

In the middle of 2002, EisnerAmper referred plaintiffs, who had been using EisnerAmper as their accountant, to Scudillo and

---

[1] A "Ponzi" scheme is "a classic, pyramid-style investment fraud," in which "no investment is ever made." In re Application of Matthews, 94 N.J. 59, 64 (1983).  Rather, "the promised returns for the first set of investors are paid from the proceeds garnered from a second set of investors.  The second set of investors is then paid off with the funds deposited by a third set of investors, and so on." Ibid.

[2] Scudillo was the managing partner and fifty percent owner of AFS.  The other fifty percent ownership interest in AFS was held by EisnerAmper.

4

AFS for investment planning.  Plaintiffs hired Scudillo and agreed to invest approximately $3.4 million in an initial portfolio.  Plaintiffs agreed to a conservative investment strategy, which Scudillo described in several documents dated November 2002 as "[w]ealth building through a prudent and conservative allocation of investments" and "[w]illing to sacrifice a higher return for principal stability."

Scudillo's compensation was calculated as a percentage of plaintiffs' total asset value under his management.  As part of the arrangement, Scudillo met with plaintiffs several times per year to discuss any changes in investment strategies.  However, plaintiffs' relationship with Scudillo was never formalized by a written contract.

In 2004, Scudillo recommended that plaintiffs purchase securitized notes in the amount of $550,000.  On Scudillo's recommendation, plaintiffs purchased two notes from Medical Provider Financial Corporation (Med Cap):  $300,000 in a Class 'A' Note on July 13, 2004; and $250,000 in a Class 'A' Note on April 10, 2006.  Plaintiffs reinvested -- again on Scudillo's advice -- the principal from these two investments into another two Med Cap notes: $300,000 in a Class 'A' Note on July 11, 2007; and $250,000 in a Class 'B' Note on May 6, 2008.

Notably, plaintiffs signed two applications with SAI for the purchase of the Med Cap notes:  one on June 29, 2004, in the

5

name of Hirsch, LLP, and the other on June 7, 2006, in the names of Michael and Robyn Hirsch. Scudillo signed each of these agreements as the "registered representative" and the "principal" of SAI. Each of the SAI applications incorporated an arbitration clause:

> This agreement contains a predispute arbitration clause. By signing an arbitration agreement the parties agree as follows:
>
> A) All parties to this agreement are giving up the right to sue each other in court, including the right to a trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed.
>
> B) Arbitration awards are generally final and binding, a party's ability to have a court reverse or modify an arbitration award is very limited.
>
> C) The ability of the parties to obtain documents, witness statements and other discovery is generally more limited in arbitration than in court proceedings.
>
> D) The arbitrators do not have to explain the reason(s) for their award.
>
> E) The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.
>
> F) The rules of some arbitration forums may impose time limits for bringing a claim in arbitration. In some cases, a claim that is ineligible for arbitration may be brought in court.

6

G) The rules of the arbitration forum in which the claim is filed, and any amendments thereto, shall be incorporated into this agreement.

All controversies that may arise between us (including, but not limited to controversies concerning any account, order or transaction, or the continuation, performance, interpretation or breach of this or any other agreement between us, whether entered into or arising before, on or after the date this account is opened) shall be determined by arbitration in accordance with the rules then prevailing of the New York Stock Exchange, Inc., or the [National Association of Securities Dealers (NASD)] as I may designate. If I do not notify you in writing of my designation within five (5) days after I receive from you a written demand for arbitration, then I authorize you to make such designation on my behalf. I understand that judgment upon any arbitration award may be entered in any court of competent jurisdiction.

Based on that contractual language, arbitration was to be handled by the Financial Industry Regulatory Authority (FINRA),[3]

---

[3] In many ways, FINRA arbitration procedures are similar to those used in other institutional arbitrations, such as the American Arbitration Association. The claimant initiates the proceedings by filing a statement of claim, the respondent files an answer, and the parties together appoint three arbitrators. FINRA Code of Arbitration Procedure for Customer Disputes §§ 12302-12303, 12400-12403 [hereinafter FINRA Code]. Prehearing conferences are scheduled to resolve preliminary issues, and discovery proceeds according to the Codes of Arbitration Procedure. Id. §§ 12500-12501, 12505-12514. At the conclusion of discovery, a hearing is held to allow the parties to present evidence and arguments in support of their claims. Id. § 12600. After the hearing, the arbitrators consider the issues and render an award. Id. § 12904.

An award rendered at the conclusion of FINRA arbitration is subject to limited review in court. The Federal Arbitration Act

an organization "created through the consolidation of NASD and the member regulation, enforcement and arbitration operations of the New York Stock Exchange" in July 2007.  FINRA, NASD and NYSE Member Regulation Combine to Form the Financial Industry Regulatory Authority - FINRA, available at http://www.finra.org/Newsroom/NewsReleases/2007/p036329 (last visited July 25, 2013).

B.

In 2008, the Class 'A' Med Cap Note for $300,000 defaulted. According to plaintiffs, Scudillo reassured them that the investment was still safe, and, at all relevant times, maintained that the Med Cap notes were low-risk securities consistent with plaintiffs' investment goals.

The following year, plaintiffs' investments in the Med Cap notes suffered additional setbacks.  The United States Securities and Exchange Commission (SEC) launched an investigation into Med Cap and placed all interest payments on hold.  In July 2009, the SEC charged Med Cap senior officers with securities fraud and placed the corporation in receivership.  Then, in January 2010, the Commonwealth of Massachusetts launched its own investigation into Med Cap and

---

provides that a court only may vacate an award in limited circumstances.  9 U.S.C.A. § 10.  If the award is not ultimately vacated, the court can confirm or modify the award.  9 U.S.C.A. §§ 9, 11.

reached similar conclusions. Taken together, these investigations indicated that the Med Cap notes were being operated as a Ponzi scheme.

Plaintiffs eventually lost the entirety of their investment in the Med Cap notes and filed two separate actions in October and November 2010. First, plaintiffs instituted arbitration proceedings with FINRA against SAI and Scudillo in October 2010. Plaintiffs alleged breach of contract, fraud, breach of fiduciary duties, negligence, gross negligence, unjust enrichment, violations of federal and state securities laws, and conspiracy. Second, plaintiffs filed a complaint in the Law Division, including a demand for trial by jury, against AFS and EisnerAmper in November 2010. Plaintiffs alleged breach of contract, violations of the New Jersey Consumer Fraud Act, breach of fiduciary duties, negligent supervision, negligent misrepresentation, violations of the New Jersey Uniform Securities Law, and professional malpractice.

In January 2011, AFS and EisnerAmper filed an answer denying the entirety of the allegations, and they filed a third-party complaint against SAI. In their third-party complaint, AFS and EisnerAmper sought indemnification and contribution, arguing that should they be found liable to plaintiffs, SAI was a joint tortfeasor.

9

Several months later, SAI filed in the Law Division a Motion to Compel Arbitration and Stay Proceedings Pending Arbitration.  In its motion, SAI argued that (1) the language of the arbitration clause is sufficiently broad to cover the disputes with AFS and EisnerAmper; (2) AFS is a party to the arbitration clause because Scudillo, who served as a representative for SAI and AFS, signed the arbitration agreement; (3) AFS and EisnerAmper are subject to the arbitration agreement under agency principles; and (4) AFS and EisnerAmper are subject to the arbitration agreement under the doctrine of equitable estoppel.  AFS and EisnerAmper joined in SAI's Motion to Compel Arbitration, and plaintiffs opposed the motion.

After hearing oral argument on the motion, the trial court granted SAI's motion.  The court relied on Alfano v. BDO Seidman, LLP, 393 N.J. Super. 560 (App. Div. 2007), in concluding that plaintiffs were "attempting to circumvent the policy favoring arbitration" by failing to name SAI as a defendant in the civil action filed in the Law Division.

The Appellate Division affirmed the trial court's judgment but relied on a different rationale.  First, the panel acknowledged this state's "long-standing policy favoring arbitration as a speedy and efficient approach to dispute resolution," as well as the Federal Arbitration Act's preference

10

to resolve contractual ambiguities in favor of arbitration. Second, the panel broadly interpreted the arbitration clause in light of the preference for arbitration. Third, the panel applied equitable estoppel -- predominantly using the analysis from EPIX Holdings Corp. v. Marsh & McLennan Cos., Inc., 410 N.J. Super. 453, 463-68 (App. Div. 2009) -- to conclude that compelling arbitration was the appropriate course of action. In its view, "[t]he complex and intertwined relationship between and among plaintiffs, Scudillo, EisnerAmper and AFS is an 'integral' one which provides 'sufficient basis to invoke estoppel,'" (quoting id. at 466).

We granted plaintiffs' petition for certification. Hirsch v. Amper Fin. Servs., LLC, 212 N.J. 288 (2012).

## II.

Plaintiffs argue that the Appellate Division erred in affirming the order compelling arbitration. They maintain that arbitration can only be compelled when parties agree to arbitrate their disputes by inserting an arbitration clause into a contract. Because the arbitration clause here only applied to disputes arising between plaintiffs and SAI, the arbitration should exclude AFS and EisnerAmper.

Plaintiffs contend that the Appellate Division's application of equitable estoppel to compel arbitration should be rejected because such a decision negates the contractual

11

requirement for arbitration. Alternatively, even should equitable estoppel be appropriate, plaintiffs argue that its application here contravenes language found in the arbitration clause.

Further, plaintiffs call on this Court to establish the parameters of the theory of intertwinement applied by the Appellate Division. Finally, plaintiffs argue that the appropriate forum, if all the claims must indeed be resolved together, is the Law Division rather than FINRA because the bulk of their claims primarily arise out of interactions and dealings with AFS and EisnerAmper, not with SAI.

In response, SAI argues that the Appellate Division properly applied the well-recognized doctrine of equitable estoppel to compel arbitration. SAI contends that the plain language of the arbitration clause is sufficiently broad to encompass the claims against AFS and EisnerAmper. In its view, all of the claims arose out of the transactions contemplated by the contract between plaintiffs and SAI. Specifically, the claims focus on the purchase of the Med Cap notes, which were the focus of the contract.

Moreover, SAI cites the strong presumption in favor of arbitration in both state and federal courts. For that reason, SAI contends that the Superior Court is not the appropriate

12

forum for resolving the claims; instead, the claims should be resolved through the FINRA arbitration.

AFS and EisnerAmper adopted SAI's arguments without submitting additional briefs.

III.

A.

Orders compelling arbitration are deemed final for purposes of appeal. R. 2:2-3(a); GMAC v. Pittella, 205 N.J. 572, 587 (2011). We review those legal determinations de novo. See Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995) ("A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference."). In reviewing such orders, we are mindful of the strong preference to enforce arbitration agreements, both at the state and federal level. See Hojnowski v. Vans Skate Park, 187 N.J. 323, 341-42 (2006) (noting federal and state preference for enforcing arbitration agreements); Garfinkel v. Morristown Obstetrics & Gynecology Assocs., P.A., 168 N.J. 124, 131 (2001) (recognizing "arbitration as a favored method of resolving disputes").

The Federal Arbitration Act (FAA), 9 U.S.C.A. §§ 1 to 16, was enacted "to abrogate the then-existing common law rule disfavoring arbitration agreements 'and to place arbitration agreements upon the same footing as other contracts.'"

13

Martindale v. Sandvick, Inc., 173 N.J. 76, 84 (2002) (quoting

Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 24, 111 S.

Ct. 1647, 1651, 114 L. Ed. 2d 26, 36 (1991)).  Section 2 of the

FAA provides:

> A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.
>
> [9 U.S.C.A. § 2.]

The New Jersey Arbitration Act (Arbitration Act), N.J.S.A.

2A:23B-1 to -32, is similar in nature to the FAA.  The

Arbitration Act, in part, provides "[a]n agreement contained in

a record to submit to arbitration any existing or subsequent

controversy arising between the parties to the agreement is

valid, enforceable, and irrevocable except upon a ground that

exists at law or in equity for the revocation of a contract."

N.J.S.A. 2A:23B-6(a).

However, the preference for arbitration "is not without

limits."  Garfinkel, supra, 168 N.J. at 132.  A court must first

apply "state contract-law principles . . . [to determine]

whether a valid agreement to arbitrate exists."  Hojnowski,

14

supra, 187 N.J. at 342. This preliminary question, commonly referred to as arbitrability, underscores the fundamental principle that a party must agree to submit to arbitration. Garfinkel, supra, 168 N.J. at 132 ("The point is to assure that the parties know that in electing arbitration as the exclusive remedy, they are waiving their time-honored right to sue." (internal quotation marks omitted)); Guidotti v. Legal Helpers Debt Resolution, L.L.C., 716 F.3d 764, ___ (3d Cir. 2013) (slip op. at 13) (explaining that "a judicial mandate to arbitrate must be predicated upon the parties' consent" (citation omitted)). Notably, the arbitrability analysis is expressly included in the Arbitration Act. See N.J.S.A. 2A:23B-6(b) ("The court shall decide whether an agreement to arbitrate exists . . . .").

We have explained that "'a state cannot subject an arbitration agreement to more burdensome requirements than those governing the formation of other contracts.'" Hojnowski, supra, 187 N.J. at 342 (quoting Leodori v. CIGNA Corp., 175 N.J. 293, 302, cert. denied, 540 U.S. 938, 124 S. Ct. 74, 157 L. Ed. 2d 250 (2003)). In evaluating the existence of an agreement to arbitrate, a court "consider[s] the contractual terms, the surrounding circumstances, and the purpose of the contract." Marchak v. Claridge Commons, Inc., 134 N.J. 275, 282 (1993) (citation omitted).

15

After finding the existence of an arbitration clause, a court then must evaluate whether the particular claims at issue fall within the clause's scope.  A court must look to the language of the arbitration clause to establish its boundaries.  See Garfinkel, supra, 168 N.J. at 132.  Importantly, "a court may not rewrite a contract to broaden the scope of arbitration."  Ibid. (internal quotation marks omitted).

B.

At issue in this appeal is the application of equitable estoppel to compel arbitration.  The United States Supreme Court has recognized that, in the context of arbitration, "'traditional principles' of state law allow a contract to be enforced by or against nonparties to the contract through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third party beneficiary theories, waiver and estoppel.'"  Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 631, 129 S. Ct. 1896, 1902, 173 L. Ed. 2d 832, 840 (2009) (emphasis added) (quoting 21 Williston on Contracts § 57:19, at 183 (4th ed. 2001)).  In other words, in assessing whether parties can be compelled to arbitrate, courts can use principles of contract law even in the absence of an express arbitration clause.  See ibid.

As previously explained by this Court,

> [e]quitable estoppel has been defined as

16

> the effect of the voluntary
> conduct of a party whereby he is
> absolutely precluded, both at law
> and in equity, from asserting
> rights which might perhaps have
> otherwise existed . . . as against
> another person, who has in good
> faith relied upon such conduct,
> and has been led thereby to change
> his position for the worse . . . .
>
> The doctrine is designed to prevent a
> party's disavowal of previous conduct if
> such repudiation would not be responsive to
> the demands of justice and good conscience.
>
> [Heuer v. Heuer, 152 N.J. 226, 237 (1998)
> (internal quotation marks and citations
> omitted).]

Equitable estoppel "is invoked in the interests of justice, morality and common fairness." Knorr, supra, 178 N.J. at 178 (internal quotation marks omitted); see also Summer Cottagers' Assoc. of Cape May v. City of Cape May, 19 N.J. 493, 503-04 (1955) (noting that doctrine prevents party "from taking a course of action that would work injustice and wrong to one who with good reason and in good faith has relied upon such conduct" (citations omitted)).

To establish equitable estoppel, parties must prove that an opposing party "engaged in conduct, either intentionally or under circumstances that induced reliance, and that [they] acted or changed their position to their detriment." Knorr, supra, 178 N.J. at 178 (citation omitted). In other words, equitable

17

estoppel, unlike waiver, requires detrimental reliance.  Ibid.
With that in mind, two Appellate Division decisions warrant our
review.

In EPIX Holdings, supra, the Appellate Division recognized
that "a non-signatory to an arbitration agreement may compel a
signatory to arbitrate."  410 N.J. Super. at 463.  EPIX Holdings
Corp., a professional employer organization, entered into a
workers' compensation insurance agreement with National Union
Fire Insurance Company (National Union), a subsidiary of
American International Group, Inc. (AIG).  Id. at 459-60.  The
Payment Agreement between EPIX and National Union "expressly set
forth in detail the terms and conditions of EPIX's payment
obligation."  Id. at 460.  "The Payment Agreement also contained
an arbitration clause" which provided that disputes other than
payment issues "must be submitted to arbitration."  Id. at 460-
61.  EPIX ultimately filed suit against National Union, AIG, and
several other related companies.  Id. at 461.  The claims arose
out of "an alleged elaborate conspiracy . . . to manipulate the
market for insurance."  Ibid. (internal quotation marks
omitted).  AIG, in response, moved to compel arbitration, but
the trial court denied the motion because AIG was not a party to
the Payment Agreement containing the arbitration clause even
though its subsidiary was a signatory.  Id. at 462.

18

The Appellate Division reversed, reasoning that (1) "AIG ha[d] standing as a non-signatory to compel arbitration" because the claims and parties were "substantially interconnected," id. at 467-68, and (2) EPIX's claims fell within the scope of the arbitration clause, id. at 475. The panel noted that "the principle of equitable estoppel has been invoked, under appropriate circumstances, to force an objecting signatory to arbitrate the same claims against a non-signatory as alleged against the other party to the contract." Id. at 465-66. "[E]ven where the inextricable connectivity was not considered itself dispositive of the issue, the combination of the requisite nexus of the claim to the contract together with the integral relationship between the non-signatory and the other contracting party [has been] recognized as a sufficient basis to invoke estoppel." Id. at 466 (emphasis removed).

The conclusion in EPIX Holdings stands in contrast to the result of an earlier decision in Angrisani v. Financial Technology Ventures, L.P., 402 N.J. Super. 138 (App. Div. 2008). There, the plaintiff, Frank Angrisani, entered into two contracts: an employment contract with Nexxar Group, Inc. (Nexxar)[4] and a stock purchase agreement with Financial Technology Ventures, L.P. (FT Ventures) to purchase shares in

---

[4] The plaintiff actually entered into a contract with Nexxar's predecessor; however, that distinction is not relevant for purposes of this discussion. See id. at 143-44.

Nexxar.  Id. at 143-44.  The employment contract with Nexxar included an arbitration clause that required the plaintiff and Nexxar to "arbitrate any and all controversies, claims or disputes arising out of" the contract or employment relationship before the American Arbitration Association.  Id. at 149.  However, the stock purchase agreement with FT Ventures did not contain an agreement to arbitrate disputes.  Id. at 145.

Angrisani filed claims against Nexxar and FT Ventures after his agreements with the two companies took a turn for the worse.  Id. at 145-46.  Angrisani asserted multiple claims against FT Ventures and Nexxar.  Id. at 146.  In response, Nexxar and FT Ventures jointly filed a motion to compel arbitration.  Ibid.  The trial court granted the motion, ibid., but the Appellate Division reversed in part, id. at 147.  The panel concluded that, although Angrisani's "claims against Nexxar [fell] within the arbitration provision of his employment agreement," the "claims against FT Ventures [were] not covered by the arbitration provision."  Ibid.  In other words, Angrisani could "not be compelled to arbitrate those claims [against FT Ventures] because the stock purchase agreement . . . [did] not provide for arbitration."  Ibid.

The Appellate Division specifically rejected FT Ventures's argument that Angrisani was "equitably estopped from refusing to arbitrate those claims because they [were] intertwined with and

20

dependent upon the employment agreement." Id. at 153 (internal quotation marks omitted). The panel reasoned that Angrisani "did not engage in any course of conduct that could support a finding of equitable estoppel." Ibid. The panel also distinguished several federal cases that applied equitable estoppel to compel arbitration, finding that "those cases generally involve[d] situations where a party to a contract containing an arbitration clause [sought] to bring an action . . . against a non-signatory to the contract that [was] closely aligned to a contracting party, such as a parent or successor corporation." Id. at 154.

These two Appellate Division decisions are not in synchronicity in their rationales concerning the application of equitable estoppel to compel arbitration. The panel's decision in this appeal further reflects an emerging "intertwinement" theory -- described as an extension of equitable estoppel -- that has never been addressed by this Court. We now address that doctrine and limit its application.

IV.

A.

At the outset, it must be acknowledged that, as a matter of New Jersey law, courts properly have recognized that arbitration may be compelled by a non-signatory against a signatory to a contract on the basis of agency principles. See, e.g., Alfano,

21

supra, 393 N.J. Super. at 569-70 (compelling arbitration after finding agency relationship existed between non-signatory and signatory to contract). That said, although equitable estoppel may be used in certain circumstances as a basis to compel arbitration, its use has limited applicability. Application of estoppel to compel arbitration, when the rationale rests solely on the connection between the parties and claims, overlooks our case law emphasizing that parties are giving up their right to sue in court when they agree to use the alternative dispute resolution technique of arbitration. See Garfinkel, supra, 168 N.J. at 132.

Stated simply, we reject intertwinement as a theory for compelling arbitration when its application is untethered to any written arbitration clause between the parties, evidence of detrimental reliance, or at a minimum an oral agreement to submit to arbitration. As explained earlier, equitable estoppel "is invoked in the interests of justice, morality and common fairness." Knorr, supra, 178 N.J. at 178 (internal quotation marks omitted). Estoppel cannot be applied solely because the parties and claims are intertwined, and, to the extent that EPIX Holdings suggests otherwise in its rationale, it extends equitable estoppel beyond its proper scope.

We have not yet had the occasion to review the underlying rationale used in EPIX Holdings to compel arbitration. The

22

decision to compel arbitration in EPIX Holdings was appropriate given the agency relationship between the parent and subsidiary insurance corporations in the litigation. See 410 N.J. Super. at 458-59. However, we reject that panel's reliance on a theory of intertwinement under the guise of equitable estoppel. The Appellate Division was mistaken in concluding that the intertwinement of claims and parties in the litigation -- in and of itself -- was sufficient to give a non-signatory corporation standing to compel arbitration. See id. at 467-68. The appropriate analysis would have focused on the agency relationship between the parent and subsidiary corporations in relation to their intertwinement with the plaintiff's claims and the relevant contractual language.

Further, the doctrine of equitable estoppel does not apply absent proof that a party detrimentally rely on another party's conduct. See Knorr, supra, 178 N.J. at 178. Reliance is critical when a party seeks to compel arbitration using that doctrine. It underlies the rationale for applying equitable estoppel in the first place, namely, "[t]he doctrine is designed to prevent a party's disavowal of previous conduct if such repudiation would not be responsive to the demands of justice and good conscience." Heuer, supra, 152 N.J. at 237 (internal quotation marks omitted); see also Angrisani, supra, 402 N.J. Super. at 153 (holding that doctrine of equitable estoppel was

23

inapplicable to compel arbitration because doctrine operates to "prevent injustice by not permitting a party to repudiate a course of action on which another party has relied to his detriment" (internal quotation marks omitted)).

                              B.

Turning to this appeal, we note initially that many of the claims in plaintiffs' complaint -- including those rooted in negligence and breach of contract -- implicate the right to a jury trial. See Jersey Cent. Power & Light Co. v. Melcar Util. Co., 212 N.J. 576, 593-94 (2013) (reiterating constitutional right to jury trial for "common-law cause of action in negligence"); Wood v. N.J. Mfrs. Ins. Co., 206 N.J. 562, 578 (2011) (emphasizing that "breach of contract claim was at common law and remains today an action triable to a jury"). That recognition informs our analysis given the importance of ensuring that a party has actually waived its right to initiate a claim in court in favor of submitting to binding arbitration. See Garfinkel, supra, 168 N.J. at 132 (noting "[i]n the absence of a consensual understanding, neither party is entitled to force the other to arbitrate their dispute" (alteration in original and internal quotation marks omitted)). Nevertheless, we must review the relevant contractual relationships to determine whether plaintiffs agreed to arbitrate with AFS and EisnerAmper.

                              24

No party disputes that the only applicable arbitration clause is the one contained in the contract between plaintiffs and SAI, which provides in relevant part:

> All controversies that may arise between us (including, but not limited to controversies concerning any account, order or transaction, or the continuation, performance, interpretation or breach of this or any other agreement between us, whether entered into or arising before, on or after the date this account is opened) shall be determined by arbitration in according with the rules then prevailing of the New York Stock Exchange, Inc., or the NASD as I may designate.

Importantly, this arbitration clause makes no mention of other parties aside from Scudillo, who served as SAI's representative when executing the agreement containing the arbitration clause. Though the language in the arbitration clause is sufficiently broad to cover any and all disputes related to the business transactions between plaintiffs and SAI, it does not embrace any express inclusion of claims involving other parties. See Garfinkel, supra, 168 N.J. at 132. Thus, we conclude that there is no express contractual arbitration obligation with respect to the other defendants, AFS or EisnerAmper.

Moreover, we disagree with SAI's argument that AFS or EisnerAmper had standing to compel arbitration under an agency relationship. Although Scudillo did sign the contract containing the arbitration clause, he did so as an agent of SAI,

25

not as an agent of AFS or EisnerAmper.  SAI shares no corporate ownership with AFS or EisnerAmper.  And, notably, AFS and EisnerAmper conceded before the Law Division that they "are separate and distinct corporate entities."  As a result, in this case, an agency relationship cannot serve as the basis for compelling arbitration.  Contra Alfano, supra, 393 N.J. Super. at 569-70 (finding agency relationship between signatory and non-signatory); EPIX Holdings, supra, 410 N.J. Super. at 458-59 (explaining relationship between defendants as parent and subsidiary corporations).

Though plaintiffs' claims against SAI, AFS, and EisnerAmper all arose out of the same alleged Ponzi scheme involving the Med Cap notes, and each of the parties had some form of relationship with each other, that intertwinement of claims and parties, by itself, is insufficient to warrant application of equitable estoppel.  We see no evidence in the record that AFS or EisnerAmper expected to arbitrate their disputes in detrimental reliance on plaintiffs' conduct.  See Heuer, supra, 152 N.J. at 237.  We also find nothing in the record to suggest that AFS or EisnerAmper knew about the arbitration clause in plaintiffs' agreement with SAI, let alone expected to reap the benefits that accompany arbitration, prior to SAI raising it as an issue in the Law Division.  The responsive pleadings filed by AFS and EisnerAmper made no request for arbitration, nor did they even

26

mention the existence of an arbitration clause.  See <u>Angrisani</u>, <u>supra</u>, 402 <u>N.J. Super.</u> at 153-54.

Finally, although we are sensitive to the preference for resolving ambiguities in arbitration clauses in favor of compelling arbitration, <u>see</u> <u>Hojnowski</u>, <u>supra</u>, 187 <u>N.J.</u> at 341-42, that preference only applies when an agreement exists between the parties to arbitrate their disputes.  In other words, absent express contractual language signaling an agreement to arbitrate, a court has little to interpret in favor of compelling arbitration.  See <u>Garfinkel</u>, <u>supra</u>, 168 <u>N.J.</u> at 132.  Instead, when parties have not expressly agreed to arbitrate their disputes -- as is the case here between plaintiffs, AFS, and EisnerAmper -- careful scrutiny is necessary to determine whether arbitration is nonetheless appropriate.

To conclude, because the record here does not support that AFS or EisnerAmper detrimentally relied on plaintiffs' conduct, application of equitable estoppel was unwarranted.  Plaintiffs never sought to arbitrate their disputes with AFS or EisnerAmper, and compelling them to do so would result in an injustice contrary to the doctrine's intent.  SAI's motion to compel arbitration should have been denied.[5]

---

[5] On remand, the Law Division has a number of procedural tools at its disposal to manage the proceedings, including staying the

V.

For the reasons expressed above, we reverse the Appellate Division's judgment affirming the order compelling arbitration, and we remand for additional proceedings.


CHIEF JUSTICE RABNER; JUSTICES ALBIN, HOENS, and PATTERSON; and JUDGES RODRÍGUEZ and CUFF (both temporarily assigned) join in JUSTICE LaVECCHIA's opinion.

---

litigation during the pendency of the FINRA arbitration.  See N.J.S.A. 2A:23B-7(e).  Additionally, if any claim is severable from the claims proceeding to arbitration between plaintiffs and SAI, the Law Division may limit the stay to certain claims.  See N.J.S.A. 2A:23B-9(f), (g); GMAC, supra, 205 N.J. at 583 n.7 (explaining trial court "may limit the stay to the arbitrable claim if the claims are severable").

28

SUPREME COURT OF NEW JERSEY

NO. ___A-9___        SEPTEMBER TERM 2012

ON CERTIFICATION TO _____Appellate Division, Superior Court_____


MICHAEL E. HIRSCH, ROBYN J.
HIRSCH, and HIRSCH, LLP,

       Plaintiffs-Appellants,

          v.

AMPER FINANCIAL SERVICES,
LLC, and EISNERAMPER, LLP
(f/k/a AMPER, POLITIZNER &
MATTIA, LLP),

       Defendants/Third-Party
       Plaintiffs-Respondents,

          v.

SECURITIES AMERICA, INC.,

       Third-Party Defendant-Respondent.



DECIDED        August 7, 2013_____
            Chief Justice Rabner         PRESIDING
_____
OPINION BY    Justice LaVecchia_____

CONCURRING/DISSENTING OPINIONS BY  _____

DISSENTING OPINION BY  _____

| CHECKLIST | REVERSE AND REMAND | |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | X | |
| JUSTICE HOENS | X | |
| JUSTICE PATTERSON | X | |
| JUDGE RODRÍGUEZ (t/a) | X | |
| JUDGE CUFF (t/a) | X | |
| TOTALS | 7 | |