**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5388-17T4

WELLS FARGO BANK, NA,

      Plaintiff-Respondent,

v.

SUBARU 46, LLC,
DCN AUTOMOTIVE
LIMITED LIABILITY COMPANY,
and JDN AA, LLC,

      Defendants-Appellants.

_____

Argued May 30, 2019 – Decided June 25, 2019

Before Judges Koblitz, Currier, and Mayer.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-2270-18.

Rosaria A. Suriano argued the cause for appellants (Brach Eichler LLC, attorneys; Rosaria A. Suriano, of counsel and on the briefs; Kent D. Anderson, on the briefs).

Joseph Lubertazzi, Jr. argued the cause for respondent (McCarter & English, LLP, attorneys; Joseph

Lubertazzi, Jr., of counsel and on the brief; Peter M. Knob, of counsel and on the brief).

PER CURIAM

In this matter arising out of a series of loan transactions between the parties, we review the trial court's order compelling arbitration of the parties' dispute. Because we conclude the arbitration clause in the controlling credit agreement sufficiently advised these sophisticated commercial entities of their waiver of rights, and the asserted dispute falls squarely within the scope of the arbitration agreement, we affirm.

Defendants Subaru 46, LLC (Subaru), DCN Automotive Limited Liability Company (DCN), and JDN AA, LLC (JDN) are three car dealerships who have separate franchise agreements with their respective car manufacturers, requiring them to obtain a floor plan financing line of credit (floor plan line) with a lender in order to purchase cars. In 2013, plaintiff Wells Fargo Bank, N.A. became that lender when it entered into a credit agreement with Subaru.[1]

---

[1] The dealerships are all owned by the same principals. JDN, an Audi dealership, and DCN, a Hyundai dealership, were added as borrowers in modified credit agreements in 2015.

The credit agreement, secured by a floor plan note, required Subaru to maintain a "[t]rading [a]sset [e]quity" of $1.5 million.[2] The agreement contained an arbitration provision where the parties agreed "to submit to binding arbitration all claims, disputes and controversies between or among them . . . in any way arising out of or relating to (a) any credit subject hereto, or any of the [l]oan [d]ocuments . . . or (b) requests for additional credit."

Because the floor plan line was only in effect for one year, the credit agreement underwent periodic modifications. In 2014, the agreement was modified twice to reflect changes to the floor plan line. In both modified agreements, the parties affirmed that the "terms and conditions of the Note and Credit Agreement remain[ed] in full force and effect, without waiver or modification." When JDN was added to the credit agreement in 2015, the floor plan line was increased and the "[t]rading [a]sset [e]quity" provision was replaced with a clause entitled "Liquidity."[3]

---

[2] This financial condition was determined at the end of each fiscal quarter by conducting a detailed calculation of the accounts receivable, vehicle inventory, customer deposits and the unpaid principal balances on the loans.

[3] The new clause required a trading asset equity of $2 million or a "[t]rading [a]sset [e]quity [m]argin not less than [twenty percent]." As in the prior agreement, both conditions were defined.

The 2015 modified credit agreement included a more extensive arbitration clause. In pertinent part, it stated:

ARBITRATION. Upon demand of any party hereto, whether made before or after institution of any judicial proceeding, any claim or controversy arising out of or relating to the Loan Documents between the parties hereto (a "Dispute") shall be resolved by binding arbitration conducted under and governed by the Commercial Financial Disputes Arbitration Rules (the "Arbitration Rules") of the American Arbitration Association (AAA) and the Federal Arbitration Act. Disputes may include, without limitation, tort claims, counterclaims, a dispute as to whether a matter is subject to arbitration, or claims arising from documents executed in the future, but shall specifically exclude claims brought as or converted to class actions. A judgment upon the award may be entered in any court having jurisdiction. Notwithstanding the foregoing, this arbitration provision does not apply to disputes under or related to swap agreements. . . . Preservation and Limitation of Remedies. Notwithstanding the preceding binding arbitration provisions, the parties agree to preserve, without diminution, certain remedies that any party may exercise before or after [an] arbitration proceeding is brought. The parties shall have the right to proceed in any court of proper jurisdiction or by self-help to exercise or prosecute the following remedies, as applicable: (i) all rights to foreclose against any real or personal property or other security by exercising a power of sale or under applicable law by judicial foreclosure including a proceeding to confirm the sale. . . . Any claim or controversy with regard to any party's entitlement to such remedies is a Dispute.

The next page of the agreement, just above the parties' representatives' signatures, provides:

> Waiver of Jury Trial. THE PARTIES ACKNOWLEDGE THAT BY AGREEING TO BINDING ARBITRATION THEY HAVE IRREVOCABLY WAIVED ANY RIGHT THEY MAY HAVE TO JURY TRIAL WITH REGARD TO A DISPUTE AS TO WHICH BINDING ARBITRATION HAS BEEN DEMANDED.

In 2015, the parties also entered into a security agreement, in which defendants granted and transferred to plaintiff a security interest in all of defendants' assets for valuable consideration. The collateral secured "all [of defendants'] present and future indebtedness" to plaintiff.

When the credit agreement was modified to add DCN as a borrower in July 2015, the arbitration provision was not changed. A December 2016 modified credit agreement (December 2016 credit agreement) changed the floor plan line amount (decreased to $25 million), provided a $3.5 million term loan, and required a $5 million trading asset equity. There were no changes to the

5

arbitration provision.  The term loan set the interest rate at three percent above the London Inter-Bank Offered Rate (LIBOR).[4]

In January 2017, the parties entered into an International Swap Dealers Association, Inc. Master Agreement (swap agreement), and a Schedule to the Master Agreement.  The swap agreement affected the December 2016 term loan's interest rate.[5]

The maturity date of the floor plan line under the December 2016 credit agreement was December 31, 2017, or an earlier date demanded by plaintiff.  In July 2017, plaintiff's auditors reviewed defendants' books and records.  Plaintiff contends its audit revealed that defendants did not have the required $5 million trading asset equity for the fiscal quarter.

---

[4] LIBOR is "the average interest rate at which major global banks borrow from one another." LIBOR, Investopedia, https://www.investopedia.com/terms/l/libor.asp (last updated May 17, 2019).

[5] Under the swap agreement, defendants had a fixed interest rate of 4.43%, while plaintiff maintained a floating interest rate that was 3% above the LIBOR.  If the floating interest rate rose above the fixed interest rate, defendants would pay the difference of the floating interest and the fixed rate of interest.  For example, if the floating interest rate was 5%, a person calculating defendants' interest rate for that month would subtract the defendants' fixed rate of 4.43% from the 5% floating interest rate to get an interest rate of 0.57% for that month.  However, if the fixed rate was higher than the floating rate, then defendants would pay the full fixed rate of 4.43%.

A-5388-17T4

Plaintiff informed defendants' principal of the violation of the contractual covenant and advised it would not renew the floor plan line. On October 31, 2017, plaintiff served defendants with a Notice of Default and Reservation of Rights on all loans in order to "memorialize [defendants'] financial covenant defaults." The notice claimed defendants defaulted for failing to maintain the minimum trading asset equity and for not "deliver[ing] true, complete and correct financial statements" to plaintiff as required under the credit agreement.[6]

Plaintiff set the "Maturity Date [of] Default" for December 31, 2017. As a result of the default, defendants had to pay all sums due under the loan documents by that date. When defendants did not repay the loans, plaintiff advised, in a January 2018 letter, that defendants were "in default for failing to satisfy all sums due under the [l]oan [d]ocuments" on or before the maturity date. The letter stated further:

> As a result of the Maturity Date [of] Default, [defendants] are liable for interest at the default rate,[7] plus all expenses incurred by [plaintiff], including attorneys' fees, related to the [l]oan [d]ocuments.
>
> . . . .

---

[6] Plaintiff alleges defendants reported inaccurate numbers at the end of the fiscal quarter on June 30, 2017, which was discovered in the July 2017 audit.

[7] The default interest rate is four percent above the LIBOR.

> Further, the Maturity Date [of] Default results in defaults under other loan documents to which [plaintiff] and [defendants] are parties, in addition to resulting to defaults under the Swap Documents. [Plaintiff] reserves all rights and remedies related to such defaults.

On April 18, 2018, plaintiff filed a demand for arbitration with the AAA, seeking to collect "all sums owed under loan agreements, notes and guaranties" from defendants. In an amended demand for arbitration, filed May 30, 2018, plaintiff sought "an award for all sums due under the Floor Plan Line, Term Loan, notes evidencing these loans and [Floor Plan Line] Loan Documents at the time of the arbitration hearing, less any [c]ollateral recovered in the [s]tate [c]ourt [a]ction."

On April 19, 2018, plaintiff also filed a verified complaint against defendants in Superior Court, for replevin and foreclosure of the collateral that secured the loans as agreed upon in the security agreement. In conjunction with the complaint, plaintiff applied for an order to show cause with temporary restraints.

In a May 8, 2018 order, the trial court granted plaintiff permission to enter defendants' premises and inspect records and documentation regarding the collateral. That same day, defendants filed an answer and counterclaim.

In June 2018, plaintiff moved to compel arbitration of defendants' counterclaims, and to stay defendants' counterclaims in the state court action or dismiss them under Rule 4:6-2(a). The next day, defendants presented an order to show cause, seeking temporary restraints to stay the arbitration proceedings until further ordered by the trial court and preliminary injunctive relief to dismiss the demand for arbitration.

On June 15, 2018, the trial court conducted a hearing on defendants' order to show cause and plaintiff's motion to compel arbitration. Defendants argued plaintiff's claims were not arbitrable because they related to the swap agreement, and the arbitration provision in the December 2016 credit agreement excluded from arbitration "disputes under or related to swap agreements." Plaintiff contended that the amended demand for arbitration was limited to the term loan and the floor plan loan. There was no request to arbitrate the swap agreement. Plaintiff also pointed out that the credit agreement permitted an expedited replevin action outside of the arbitration proceeding.

In an oral opinion issued on the same date, the trial court stated it had to "decide whether or not an arbitration is appropriate in this case." The judge noted defendants were a "sophisticated party" and the agreements and modifications were not "contract[s] of adhesion."

9

After reviewing the credit agreements and subsequent modifications, the judge noted all of the documents contained an arbitration clause. He, therefore, found the parties had negotiated numerous agreements, requiring their disputes to be resolved in an arbitration forum. He stated, "[Defendants] had waived [their] right to proceed and obtain judicial relief." In addressing the swap agreement, the trial court found:

> [The swap agreement was] truly just an amortization schedule[]. . . .
>
> It does not go to the heart of either the credit agreement or the floor plan agreement, it's essentially a financial document setting forth rates of pay and interest and things of that sort. And it's clearly divisible from the credit and floor plan agreement, . . . which is at the heart of this particular dispute.

Because the judge concluded the arbitration provision was applicable to the parties' dispute, he ordered the parties to submit their claims, including any counterclaims, to arbitration. The order also stayed plaintiff's replevin action and "all remaining outstanding matters." In an August 2, 2018 order, the trial court stayed the arbitration proceedings during the pendency of the appeal.[8]

---

[8] Since the filing of the appeal, both the Subaru and DCN dealerships were sold. The principal balance, non-default interest for the term loans, and both floor plan lines were repaid. Defendants continue to make principal and interest payments on the floor plan line for the JDN franchise.

On appeal, defendants argue: 1) plaintiff's claim is not arbitrable because it relates to the swap agreement; 2) the December 2016 credit agreement is ambiguous, making it unenforceable; 3) the arbitration provision does not advise defendants they are forfeiting their right to seek relief in a judicial forum; and 4) plaintiff waived its right to arbitrate by filing and litigating this action in Superior Court. Plaintiff asserts it is not seeking any relief under the swap agreement, disputes the ambiguity of the arbitration clause, and contends it did not waive its right to proceed to arbitration.

Because the validity of an arbitration agreement is a question of law, we review an order allowing arbitration to proceed de novo. Barr v. Bishop Rosen & Co., Inc., 442 N.J. Super. 599, 605 (App. Div. 2015) (citing Hirsch v. Amper Fin. Servs., LLC, 215 N.J. 174, 186 (2013)). "In interpreting an arbitration clause, we rely upon basic contract principles." Alamo Rent A Car, Inc. v. Galarza, 306 N.J. Super. 384, 390-91 (App. Div. 1997) (citation omitted). In determining whether an arbitration provision governs a particular dispute, a court's "goal is to discover the intention of the parties[,]" which requires it to consider the "contractual terms, the surrounding circumstances, and the purpose of the contract." Marchak v. Claridge Commons, Inc., 134 N.J. 275, 282 (1993) (citations omitted).

11

Here, the December 2016 credit agreement contains the controlling arbitration provision.  It provides that an arbitrable dispute is "any claim or controversy arising out of or relating to the Loan Documents between the parties."  "Loan Documents" are defined as the credit agreement and the note.  These documents establish the amount of money plaintiff will lend to defendants during the loan period and the consequences of defendants' failure to satisfy its obligations.

Following an audit of defendants' finances, plaintiff believed defendants violated the minimum trading asset equity covenant in the credit agreement.  Therefore, plaintiff filed a demand for arbitration, seeking to collect the sums defendants owed under the defaulted loans.

The addendum to the amended demand detailed that defendants defaulted on the floor plan line and term loan, and delineated the specific sums owed on those loans.  Plaintiff also sought interest, default interest, attorney's fees and expenses.  The addendum continued, "[Plaintiff] seeks an award for all sums due under the [f]loor [p]lan [l]ine, [t]erm [l]oan, notes evidencing these loans and [floor plan line] [l]oan [d]ocuments . . . less any [c]ollateral recovered in the [s]tate [c]ourt [a]ction."

12

In according the December 2016 credit agreement's terms "their plain and ordinary meaning[,]" as we must, we see no ambiguity in the arbitration clause. M.J. Paquet, Inc. v. N.J. Dep't of Transp., 171 N.J. 378, 396 (2002). The crux of the parties' dispute is whether defendants defaulted under the loan documents. If the answer is yes, then plaintiff must establish the amounts owed to it under the agreements and notes. Whether a default occurred requires a scrutiny of the December 2016 credit agreement and an analysis of defendants' compliance with the trading asset equity requirement and its provision of accurate financial statements.

Defendants assert that any calculation of amounts due to plaintiff requires the use of the interest rate formula in the swap agreement. Since the swap agreement is excluded from arbitrable claims under the arbitration clause, defendants contend plaintiff cannot arbitrate any of its claims. We disagree.

The arbitration clause excludes certain claims from arbitration, specifically any claims "under or related to" the swap agreement and those that seek equitable remedies. Relief for those disputes lies in a court with appropriate jurisdiction. Here, the parties' dispute arises out of the credit agreement and its modifications. The controlling arbitration provision was included in the third, fourth, and fifth modifications of the original credit

agreement. As defendants agreed to this provision on three separate occasions, it is evident that the parties intended to be bound by its terms. Furthermore, six days after the parties executed the December 2016 credit agreement, they entered into the swap agreement. The record does not evidence any intention of the parties to nullify the arbitration provision agreed to several days earlier and in three prior loan and credit agreement modifications. Finally, plaintiff does not seek to collect any payments from defendants under the swap agreement.

Plaintiff does not dispute that a resolution of the owed interest payments will require a calculation using the rates and formula denoted in the schedule attached to the swap agreement. But the figures in the schedule are incidental to the actual dispute plaintiff has presented to arbitration – a determination of whether defendants defaulted under the December 2016 credit agreement and associated loan documents. The swap agreement itself is not the subject of a dispute by either party.

Defendants generally assert on appeal that the arbitration provision does not meet the standards enunciated in Atalese v. U.S. Legal Servs. Grp., L.P., 219 N.J. 430 (2014), therefore rendering it unenforceable. Defendants do not claim they did not understand what rights they were relinquishing, nor do they claim ignorance of a binding arbitration process.

We are satisfied that defendants' principals, as owners of three dealerships, and represented by counsel during the multiple financial transactions, can be deemed sophisticated business persons.[9] We also note the common use of binding arbitration clauses in vehicle purchase agreements requiring the consumer to bring any dispute concerning the purchase in an arbitration forum. Although we find it unnecessary to make a sweeping generalization about the applicability of Atalese to a commercial contract with sophisticated parties, we are confident this clause, under the presenting circumstances, met the objectives expressed by the Atalese Court. See generally 219 N.J. at 442-48.

We are unpersuaded by defendants' argument that plaintiff waived its right to arbitration as defendants have presented no evidence to establish a waiver. Plaintiff filed a demand for arbitration the day before it filed an action in Superior Court. The court action, grounded in replevin, is authorized under the credit agreement. It also seeks different relief than that demanded in arbitration.

---

[9] One of the principals presented a twenty-page certification in opposition to plaintiff's order to show cause, describing in detail the intricate transactions between his dealerships and plaintiff. He stated he met with or spoke weekly with a senior vice president at Wells Fargo "on matters related to the parties' lending relationship." The principal did not reference the arbitration clause or any lack of understanding regarding it.

A-5388-17T4

Moreover, the court action was stayed pending the completion of the arbitration proceedings. Therefore, defendants are able to pursue their counterclaims in both the arbitration forum and in the court action.

Because we find the parties' dispute falls squarely within the scope of the arbitration clause in the December 2016 credit agreement, we affirm the trial court's order compelling arbitration. The order staying the arbitration proceedings is vacated.

Affirm.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5388-17T4