**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3388-16T2

VICTORY ENTERTAINMENT, INC.
and NICHOLAS PANACCIONE,

    Plaintiffs-Appellants,

v.

RICHARD D. SCHIBELL, LEONARD
CASIERO and THE DEN, INC.,

    Defendants-Respondents,

and

PAGIOTIS DRAGONAS, JOSEPH
FORSTER, SALVATORE SCHIBELL
and TERENCE MARTIN,

    Defendants.

_____

        Argued April 18, 2018 — Decided June 21, 2018

        Before Judges Nugent and Geiger.

        On appeal from Superior Court of New Jersey,
        Chancery Division, Middlesex County, Docket
        No. C-000046-15.

        Paul V. Fernicola argued the cause for
        appellants (Paul V. Fernicola & Associates,
        LLC and Eugene D. Roth, attorneys; Paul V.
        Fernicola, on the brief).

Joseph B. Fiorenzo argued the cause for respondents Richard D. Schibell and Leonard Casiero (Sills Cummis & Gross, PC, attorneys; Joseph B. Fiorenzo, of counsel; Andrew W. Schwartz, on the brief).

Wendy M. Crowther argued the cause for respondent The Den, Inc. (Schibell & Mennie, LLC, attorneys, join in the brief of respondents Richard D. Schibell and Leonard Casiero).

PER CURIAM

Plaintiffs Victory Entertainment, Inc. (VEI) and Nicholas Panaccione appeal from a March 29, 2017 order dismissing their complaint with prejudice, compelling the parties to arbitrate their dispute, and discharging the special fiscal agent for defendant The Den, Inc. and from a February 28, 2017 order sealing the trial court record and deposition transcripts. We affirm the order dismissing the complaint and compelling the parties to arbitrate their dispute and reverse the order sealing the record.

I.

We glean the following facts from the record. Prior to 2012, Joseph Shamy was the majority owner of a series of adult entertainment clubs that operated under the trade name Delilah's Den.

Panaccione was the General Manager of several of Shamy's clubs. Defendant Richard D. Schibell began his business relationship with Panaccione in 1997 or 1998. At that time,

Schibell was providing legal services to Shamy as he sought to open a Delilah's Den in Toms River. Shamy offered Schibell a thirty-three percent interest in both Delilah's Den of Toms River (DDTR), a real estate company, and 1640 Lakewood Road Associates (1640 LRA), an operating company, for $150,000. The business opportunity interested Schibell but being an owner of record of an adult entertainment club concerned him. Due to his concern, Schibell decided he would be a "passive owner," using Panaccione as a nominee to hold his shares. Panaccione agreed and, in exchange for keeping Schibell's ownership interest confidential, received a ten percent ownership interest in both DDTR and 1640 LRA.

On December 13, 2002, after Schibell and Panaccione had commenced their business relationship, VEI was formed. Panaccione received a 17.5 percent ownership interest in VEI. VEI opened another adult entertainment club in Sayreville, New Jersey, with Shamy as its majority owner. The club operated under the alternate name, Delilah's Den, consistent with Shamy's other clubs.

On October 14, 2010, Panaccione was arrested for discharging a gun in his home while his wife and children were present. On November 27, 2010, Shamy suspended Panaccione for breaching company policies. Panaccione's misconduct included harassing the entertainers and abusing drugs and alcohol.

As a result of Panaccione's erratic behavior, Shamy took steps to separate his business interests from Panaccione. This culminated in a reorganization of ownership interests completed on February 5, 2012. The following individuals were parties to the reorganization agreement: Panagiotis Dragonas, Sherrie Terrell, Leonard Casiero, Panaccione, and Shamy. Before reorganization, the ownership interests in the various clubs were as follows:

> VEI: Panaccione 17.5%, Shamy 67.5%, Terrell 5%, and Dragonas 10%.
>
> DDTR: Panaccione, individually and as nominee, 33.3%; Shamy 56.7%; Terrell 5%; and Margaret Angelo 5%.
>
> 1640 LRA: Panaccione, individually and as nominee 33.3%; Shamy 56.7%; Terrell 5%; and Margaret Angelo 5%.
>
> Frank's of Millville, LLC: Casiero 10%, Panaccione 17.5%, Terrell 5%, and Shamy 67.5%.
>
> 18-22 Washington Ave, LLC: Casiero 30.77%, Panaccione 53.85%, and Terrell 15.38%.

After reorganization, the ownership interests in the various clubs were as follows:

> VEI: Panaccione 80%, individually and as nominee; and Dragonas and Casiero 20%.
>
> DDTR: Shamy 85%, Terrell 10%, and Margaret Angelo 5%.
>
> 1640 LRA: Shamy 85%, Terrell 10%, and Margaret Angelo 5%.

4                                              A-3388-16T2

> Frank's of Millville, LLC: Shamy 90% and
> Terrell 10%.
>
> 18-22 Washington Ave, LLC: Shamy 90% and
> Terrell 10%.

Panaccione, Schibell, and Casiero essentially traded all of their combined interests across the various clubs for a 100% interest in VEI and, by extension, the club in Sayreville.[1]

As part of the reorganization, Schibell, Casiero, and Panaccione agreed they would transfer ownership of the Sayreville club to a new entity so that the owners of VEI would remain liable for its prior debts and the new owners of the Sayerville club would not be responsible. On February 17, 2012, Casiero and Pannaccione incorporated The Den, Inc. (The Den) to accomplish that goal. Casiero owned a twenty percent interest in The Den, while Panaccione owned the remaining eighty percent, individually and as a nominee.[2]

The certificate of incorporation filed by Schibell authorized the corporation to issue 2500 shares of stock without par value, designated Panaccione as the sole director of the initial Board of Directors, and named Panaccione as the corporation's registered

---

[1] Dragonas shared a twenty percent interest in VEI with Casiero. Casiero acted as Dragonas's agent.

[2] Panaccione owned forty-nine percent outright, and Schibell owned thirty-one percent.

agent. The shares were distributed to Joseph Forster, The Den's manager.

The parties never prepared or executed a formal plan of reorganization. However, at least Schibell and Casiero were under the impression that, due to The Den's incorporation, the entity had assumed all of VEI's interests and VEI was no longer an operating entity or a viable company.

In June 2014, Panaccione was hospitalized for mental health issues. During the period leading up to his hospitalization, Panaccione began to suffer increasingly frequent delusions, "accusing certain people of trying to kill him," which negatively impacted the operation of The Den. During Panaccione's hospitalization, Schibell and Casiero took over management of The Den and became aware of Panaccione's mismanagement. Schibell certifies "[d]uring many spells of delusion, Panaccione would give inconceivable and incomprehensible orders to employees and entertainers, making them extremely uncomfortable in the workplace environment." Schibell further certifies Panaccione would often "threaten employees and entertainers, brandishing a gun and otherwise making threats of physical harm against those who would not accede to his ways." Panaccione also allegedly refused to follow standard record keeping practices, let several policies

lapse, converted money, failed to remit payments to various vendors, used narcotics, and sexually harassed the entertainers.

Upon his release from the hospital, Panaccione sought to resume management of The Den. Wary of allowing Panaccione to reassume his role as manager, Schibell and Casiero informed Panaccione he could not "come back to run the bar" "[u]ntil he got better and got treatment." To this end, several communications were sent between the parties regarding Panaccione's role at The Den.

In August 2014, Schibell and Casiero met with Panaccione to discuss conditions that would be "imposed if he were to come back into the bar."[3] During the meeting, Panaccione offered to buy out Schibell's thirty-one percent interest in The Den for $900,000. Panaccione also agreed to buy out Casiero's twenty percent interest in The Den for $600,000. Panaccione, Schibell, and Casiero agreed to the buyout terms and shook hands on the deal.

On September 4, 2014, Schibell wrote to Panaccione to remind him the three men had agreed to a price for their combined interests in The Den and confirmed the agreement with a handshake. In his letter, Schibell also suggested Panaccione retain an attorney so they could properly document their agreement.

---

[3] Forster, Terence Martin, and John Catania, Schibell's driver, also attended the meeting.

Panaccione consulted with several attorneys after the parties made this agreement.

Panaccione was unable to raise the funds necessary to complete the purchase. As a result, the parties agreed to negotiate a revised agreement (the Sales Agreement) whereby Terence Martin,[4] Panaccione's "trusted" associate, would serve as a nominee to complete the purchase on behalf of Panaccione.

As Panaccione described the arrangement to his then-wife, Cindy Styron, "he was going to have [Terence Martin] buyout Lenny [Casiero] and Richard [Schibell] and basically it was for him. He was going to end up with the whole 100 percent of the clubs using [Terence]." Styron also testified it was Panaccione's idea to use Martin as the buyer.

At Panaccione's insistence, Schibell and Casiero agreed Panaccione would have a fifty percent interest in The Den as opposed to the forty-nine percent interest he previously held. However, this change had the potential to lead to deadlocks between Panaccione on one side and Schibell and Casiero on the other. To resolve potential impasses, the parties agreed to negotiate a separate Shareholder/Stakeholder (Deadlock) Agreement (the Deadlock Agreement).

---

[4] Martin's first name is spelled "Terence" in the documents but "Terrance" in the transcripts.

Ultimately, the parties agreed to the terms of the Sales Agreement and Deadlock Agreement. On November 7, 2014, Panaccione and Martin appeared together at Schibell's home. Panaccione brought a folder containing the agreements, which the parties signed that day.

Following the meeting at Schibell's home, Panaccione and Martin went to The Den and informed Forster they "just bought out Richard [Schibell] and Lenny [Casiero]." Later that night, the parties signed additional copies of the Sales Agreement and Deadlock Agreement. All interested parties were present. The parties also signed stock certificates, and Panaccione and Martin executed new shares in The Den. The shares in The Den are expressly subject to the terms and conditions of the Sales Agreement and the Deadlock Agreement.

The parties to the Sales Agreement are Schibell, Casiero, and Martin. The Sales Agreement requires Martin to remit payment of the purchase price plus interest over a ten-year term. It further provides:

> 3. It is further agreed and understood that unless the sums provided for within; to wit, $1.5 Million, have been fully and timely paid, Buyer shall nominate and irrevocably appoint Richard D. Schibell and Lenny Casiero as its/his appointees under separate "deadlock/voting" agreement.

The parties to the Deadlock Agreement are Martin and Panaccione. The agreement identifies the relevant entity as "The Den, Inc." and provides in relevant part:

> WHEREAS, the parties hereto have agreed to a workout agreement wherein stock ownership and voting rights have been established to avoid issues of deadlock; and
>
> WHEREAS, the parties hereto have had opportunity to consult with independent legal counsel and fully understand the terms and conditions hereafter set forth;
>
> BE IT RESOLVED AND AGREED, AS FOLLOWS:
>
> 1. Nicholas Panaccione agrees that his shareholder interest [in] The Den . . . shall be set at and deemed to be 50% . . . ;
>
> 2. Terence Martin agrees that his shareholder interest in The Den . . . shall be set and deemed to be 50% . . . ;
>
> 3. So as to avoid deadlock, it is agreed and understood that . . . Martin shall nominate two nominees who shall vote on any and all issues in the ordinary course or otherwise, with any two of the three assignees constituting a majority or quorum for voting purposes, i.e., . . . Panaccione with one of the Martin nominees, or two of the Martin nominees constituting a majority or quorum for voting purposes. . . .
>
> 4. It is further agreed and understood that the aforesaid mechanism is to break deadlock by virtue of the even split of share hold interest.
>
> . . . .

7. It is expressly agreed and understood that the within voting process shall apply to any expenditure in excess of $200 and any and all other matters in the extraordinary and ordinary course of conduct of the within business. By way of illustration and not limitation: hiring and firing of employees, setting standards in operation, modality of operation, opening bank accounts, signing checks, making deposits.

. . . .

10. It is further agreed and understood that the within writing shall be governed in accordance with the laws obtaining in the State of New Jersey and that should there be any dispute hereunder, the same shall be submitted to binding arbitration wherein . . . Panaccione and . . . Martin may select arbitrators of their own designation within two weeks of the demand thereof, which arbitrators in turn shall select a third, or neutral, arbitrator within thirty days thereafter. Agreement by shareholder/shareholders representatives two of three shall be binding and not subject to arbitration; only when two of three cannot agree is this clause operable.

Casiero testified he discussed the arbitration provision with Panaccione who did not object to its inclusion, agreeing they did not "want their dirty laundry out there."

After the execution of the agreements, Panaccione resumed a limited role at The Den with Martin still operating the bar. However, Panaccione quickly began causing problems again — "the same issues that were [occurring] prior to [the parties] signing [the] agreement." As a result, in January 2015, Schibell and

11

Casiero exercised their authority and removed Panaccione from all dealings with The Den until he could demonstrate he had the capacity to properly manage the business.

After being removed from management because of his misconduct, Panaccione commenced this civil action in March 2015. In the complaint, Panaccione alleged Schibell had all of The Den's mail "'forwarded' to himself so as to seize control of all accounting functions . . . , and otherwise engaged in conduct to frustrate Panaccione's ability to enjoy the fruits of The Den's business, including distribution of profits and monies due and owing to Panaccione for services provided." Panaccione also claimed Schibell removed funds from The Den's bank accounts, transferred The Den's funds to his own trust account, determined when to make distributions, otherwise made unilateral decisions to pay invoices, and gifted certain of The Den's assets to "loyal" employees. Panaccione further alleged Schibell "advised in certain correspondence that he considered Panaccione's interest in The Den to somehow be less than a majority at fifty (50%) percent."

The complaint primarily sought to compel Schibell and Casiero "to sell at fair value their membership interests, if any, in Victory Entertainment and/or The Den to plaintiffs [VEI and Panaccione]." Among the causes of action in the complaint,

12                                    A-3388-16T2

Panaccione alleges: minority oppression in violation of N.J.S.A. 14A:12-7 (count one), fraudulent conveyance of assets (count two), tortious interference with prospective economic advantage (count three), and breach of fiduciary duty (count five). Notably, each of the alleged supporting facts postdate the execution of the Deadlock Agreement.

On May 26, 2015, the trial court dismissed the complaint and ordered "all claims between and among all parties" to be arbitrated. Panaccione appealed. We found several factual and corresponding legal issues remained unresolved. Victory Entertainment, Inc. v. Schibell, No. A-4334-14 (App. Div. July 28, 2016). Specifically, we raised the following issues for consideration by the trial court on remand: (1) the transfer of interest in the Sayerville club from VEI to The Den, (2) Panaccione's knowledge of the Sales Agreement, (3) Schibell and Casiero's designation as agents of Martin and/or as third-party beneficiaries under the Deadlock Agreement, and (4) the nature of allegations pre- and post-Deadlock Agreement and whether they are within the scope of the arbitration provision. We vacated the dismissal of the complaint in favor of arbitration and remanded for further proceedings. Id. (slip op. at 19). We added, "[s]hould defendants file a formal motion to dismiss the complaint and compel arbitration, we leave to the trial court, in the

exercise of its discretion, whether to conduct a hearing to make an appropriate record." Ibid.

On September 14, 2016, defendants renewed their motion to dismiss the complaint and compel arbitration. In February and March 2017, the trial court held a six-day plenary hearing to address the issues on remand. During the hearing, defendants presented the testimony of six witnesses: Schibell, Casiero, Panaccione, Styron, Forster, and Dan Silva, a friend Panaccione had attempted to borrow money from in order to purchase the shares for The Den. Plaintiffs presented one witness: Martin. The judge found Panaccione to not be credible, stating, "Mr. Panaccione's testimony was replete with inconsistencies and numerous falsehoods." In contrast, the judge found Schibell and Casiero's testimony "were consistent with each other, the documentation, evidence, and other witnesses who testified at the haring — Mr. Forster, Mr. Panaccione's former wife (Cindy [Styron]) and Mr. Silva."

The judge determined, after the 2012 reorganization, "Mr. Panaccione, Mr. Schibell and Mr. Casiero were left with 100% ownership of The Den, Inc." The judge found Martin, Schibell, and Casiero executed the Sales Agreement, by which Schibell and Casiero agreed to sell their fifty percent interest in the Den to Panaccione through his nominee, Martin. The judge also found

Martin and Panaccione signed a Deadlock Agreement, under which Schibell and Casiero were appointed as Martin's nominees.

The judge held the Deadlock Agreement and Sales Agreement arose from a single transaction because they were executed on the same day, pertain to the control and management of the same company, and contain numerous cross-references. As a result, the judge held Schibell and Casiero, as parties to the Sales Agreement, have standing to enforce the arbitration clause. Moreover, the judge found the Deadlock Agreement was designed, in part, to protect the interest of Schibell and Casiero pending the completion of the sale of their interest to Panaccione (using Martin as a nominee). The judge also determined Schibell and Casiero could enforce the arbitration provision either as third-party beneficiaries or Martin's agents.

Finally, the judge held plaintiffs' claims were within the scope of the arbitration provision. He concluded plaintiffs' claims either implicate the Deadlock Agreement explicitly or, to the extent plaintiffs seek compensatory damages, the alleged conduct occurred after the parties signed the Deadlock Agreement or related to the execution of the Deadlock Agreement.

The judge dismissed the complaint and ordered plaintiffs to arbitrate their claims against defendants. This appeal followed.

On appeal, plaintiffs raise the following points:

POINT I

THE PRIOR RULING BY THE APPELLATE DIVISION IN
THIS MATTER CONFIRMS APPELLANTS' CLAIMS ARE
NOT SUBJECT TO ARBITRATION

POINT II

THE TRIAL COURT ERRED IN DISMISSING
APPELLANTS' CLAIMS WITH PREJUDICE AND
COMPELLING THE PARTIES TO PROCEED TO
ARBITRATION

POINT III

THE TRIAL COURT ERRED IN SEALING THE TRIAL
COURT RECORD

## II.

Plaintiffs contend we previously ruled their claims are not subject to arbitration. Plaintiffs base this claim on our not addressing whether the arbitration clause "is part of a unitary agreement to which they are signatories." Plaintiffs further claim we previously determined an agency relationship did not exist between Schibell, Casiero, and Martin. Additionally, plaintiffs argue defendants did not provide the trial court with sufficient evidence regarding Schibell and Casiero's role as Martin's agent. In light of the record created during the plenary hearing on remand, we are unpersuaded by these arguments.

In our prior opinion, we reviewed an order granting defendants' motion to dismiss the complaint in favor of arbitration. The trial court entered the order without conducting

16                                                      A-3388-16T2

an evidentiary hearing despite there being disputed facts. We stated we were unable to discern from the "somewhat sparse" motion record "whether an enforceable arbitration agreement existed among the parties as to the issues raised in the complaint." Victory Entertainment, slip op. at 2, 14. We noted "there is no evidence in the record Pannaccione was aware of the Sales Agreement, let alone that he assented to its terms." Id. at 16. We also noted "the trial court did not address the argument that Schibell and Casiero were third-party beneficiaries of the Deadlock Agreement." Id. at 18. As a result, we vacated "those parts of the orders dismissing the complaint in favor of arbitration" and remanded for further proceedings consistent with the opinion. Id. at 19. We contemplated defendants might renew their motion to dismiss. Ibid.

On remand, the trial court conducted a lengthy plenary hearing following defendants' renewed motion to dismiss the complaint and compel arbitration. The judge heard testimony from seven witnesses, considered the exhibits admitted in evidence, and issued a comprehensive ten-page written opinion. Based on this greatly expanded record, we consider the issues presented in this matter anew.

"Final determinations made by the trial court sitting in a non-jury case are subject to a limited and well-established scope of review." D'Agostino v. Maldonado, 216 N.J. 168, 182 (2013)

17

(quoting Seidman v. Clifton Sav. Bank, SLA, 205 N.J. 150, 169 (2011)). Although our review of legal determinations made by the trial court is de novo, we do not disturb the factual findings of the trial court "unless we are convinced that they are so manifestly unsupported by[,] or inconsistent with[,] the competent, relevant[,] and reasonably credible evidence as to offend the interests of justice." Ibid. (quoting Seidman, 205 N.J. at 169). Additionally, we defer to the trial court's credibility determinations because it "'hears the case, sees and observes the witnesses, and hears them testify,' affording it 'a better perspective than a reviewing court in evaluating the veracity of a witness.'" Gnall v. Gnall, 222 N.J. 414, 428 (2015) (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)).

Plaintiffs argue the arbitration clause is unenforceable because it does not contain a recitation of the rights being waived or outline an understanding that rights are being waived. Plaintiffs further argue Panaccione did not agree to waive his right to trial with respect to Schibell and Casiero and they should not be permitted to enforce an arbitration clause contained in a contract to which they are not parties. We are unpersuaded by these arguments.

In our prior opinion, we found "the record is devoid of evidence of any corporate action taken by directors, officers, or

shareholders resulting in a change of ownership — from one legal entity to a separate legal entity — of assets and operations of a viable business, namely the gentleman's club." Victory Entertainment, slip op. at 15. After considering the extensive record of the plenary hearing following remand, the judge rejected plaintiffs' argument that VEI owned the Sayerville club through The Den as a subsidiary, finding it was directly refuted by the Deadlock Agreement, which Panaccione signed.

While a formal plan of reorganization was never executed, the record plainly establishes The Den acquired VEI's ownership interest in the Sayerville club. Panaccione's contends The Den is a wholly owned subsidiary of VEI. The judge found this argument to be "directly refuted by the Deadlock Agreement." The record amply supports this conclusion, as Panaccione's position is wholly inconsistent with the terms of the Deadlock Agreement which provides Panaccione owned fifty percent of The Den's stock, with Martin owning the remaining fifty percent. The record further demonstrates VEI has never owned any of The Den's stock.

We next address the enforceability of the arbitration clause. "Because of the favored status afforded to arbitration, '[a]n agreement to arbitrate should be read liberally in favor of arbitration.'" Griffin v. Burlington Volkswagen, Inc., 411 N.J. Super. 515, 518 (App. Div. 2010) (quoting Garfinkel v. Morristown

Obstetrics & Gynecology Assoc., 168 N.J. 124, 132 (2001)). Accordingly, courts apply a 'presumption of arbitrability' unless it is clear "that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." Curtis v. Cellco P'ship, 413 N.J. Super. 26, 34 (App. Div. 2010) (quoting Epix Holdings Corp. v. Marsh & McLennan Cos., 410 N.J. Super. 453, 471 (App. Div. 2009), overruled in part on other grounds, Hirsch v. Amer. Fin. Servs., LLC, 215 N.J. 174, 193 (2013)).

When evaluating an arbitration agreement, a court must undertake a two-pronged analysis: First, the court must determine whether the parties have entered into a valid and enforceable agreement to arbitrate disputes. Martindale v. Sandvick, Inc., 173 N.J. 76, 86 (2002). Second, the court must determine whether the dispute falls within the scope of the agreement. Id. at 92.

Plaintiffs argue, to be enforceable, an arbitration agreement must state in "clear and unmistakable language:"

> (1) that the parties understand their entitlement to a judicial adjudication of their dispute and are willing to waive that right; (2) that the parties are aware of the limited circumstances under which a challenge to the arbitration award may be advanced and agree to those limitations; (3) that the parties have had sufficient time to consider the implications of their decision to arbitrate; and (4) that the parties have entered into the arbitration agreement freely and voluntarily, after due consideration of the consequences of doing so.

20

[<u>Fawzy v. Fawzy</u>, 199 N.J. 456, 482 (2009).]

Plaintiffs' reliance on <u>Fawzy</u> is misplaced. The requirements stated in <u>Fawzy</u> were intended for — and have only been applied to — arbitration provisions related to child custody issues. <u>See</u> <u>Johnson v. Johnson</u>, 204 N.J. 529, 533 (2010) (holding <u>Fawzy</u> set forth "the prerequisites for an enforceable arbitration agreement and the methodology by which an arbitration award in the child custody setting may be judicially reviewed").

Plaintiffs also argue all arbitration clauses must contain an express waiver of the right to trial, citing <u>Atalese v. U.S. Legal Serv. Group</u>, 219 N.J. 430 (2014). However, <u>Atalese</u> involved a "consumer contract" and not a commercial contract among businessmen. <u>Id.</u> at 444. <u>Atalese</u> did not extend the requirement of an express waiver of the right to pursue a claim in court to commercial contracts. <u>See</u> <u>id.</u> at 447 ("Whatever words compose an arbitration agreement, they must be clear and unambiguous that <u>a consumer</u> is choosing to arbitrate disputes rather than have them resolved in a court of law. In this way, the agreement will assure reasonable notice to <u>the consumer</u>." (emphasis added)); <u>see also</u> <u>Van Duren v. Rzasa-Ormes</u>, 394 N.J. Super. 254, 257 (App. Div. 2007) (enforcing an arbitration agreement "between two

sophisticated business parties, each represented by counsel"), aff'd o.b., 195 N.J. 230 (2008).

Additionally, plaintiffs did not waive their right to pursue statutory claims in court. Cf. Atalese (waiver of right to pursue claims under the Consumer Fraud Act, N.J.S.A. 56:8-1 to -20 and the Truth-in-Lending Contract, Warranty and Notice Act, N.J.S.A. 56:12-14 to -18, in court); Garfinkel, 168 N.J. at 135 (waiver of right to pursue claims under Law Against Discrimination, N.J.S.A. 10:5-1 to -42, in court).

To determine arbitrability, "[a] court must first apply 'state contract-law principles . . . [to determine] whether a valid agreement to arbitrate exists.'" Hirsch, 215 N.J. at 187 (second alteration in original) (quoting Hojnowski v. Vans Skate Park, 187 N.J. 323, 342 (2006)). Fundamentally, a court must determine a party agreed to submit to arbitration. Ibid. "In evaluating the existence of an agreement to arbitrate a court 'consider[s] the contractual terms, the surrounding circumstances, and the purpose of the contract.'" Id. at 188 (alteration in original) (quoting Marchak v. Claridge Commons, Inc., 134 N.J. 275, 282 (1993) (citation omitted)).

Here, the Deadlock Agreement arose from a lengthy negotiation process. Unlike the plaintiff in Atalese, plaintiffs were not "average member[s] of the public." Atalese, 219 N.J. at 442. VEI

22 A-3388-16T2

is a corporation and Pannaccione is an experienced businessman with interests in several commercial operations. He negotiated the terms of the Deadlock Agreement with the advice of counsel. The agreement clearly and unambiguously indicates the intention of the parties to submit any disputes regarding The Den to binding arbitration. For these reasons, the arbitration clause is valid, binding, and enforceable. See Van Duren, 394 N.J. Super. at 257.

With regard to whether there are issues that predate the Deadlock Agreement and, as such, would not be subject to arbitration, the record amply supports the trial court's determination that the issues raised by plaintiffs post-date the Deadlock Agreement and are within the scope of the arbitration provision.

The principle relief sought by plaintiffs is the forced sale of the interests of Schibell and Casiero to obtain complete ownership of The Den. The underlying dispute falls squarely within the scope of the arbitration provision. Additionally, it was Schibell and Casiero's exercise of authority, removing Panaccione from the Sayerville club after his inappropriate behavior, which triggered the filing of the complaint. Because these issues arose after execution of the Deadlock Agreement, they fall within the scope of the arbitration provision.

23                                                    A-3388-16T2

Plaintiffs further contend Schibell and Casiero are not entitled to enforce the arbitration clause because they are not parties to the agreement. For several reasons, we disagree.

The trial court determined the Deadlock Agreement and the Sales Agreement are a unitary agreement. Where "two documents were separate pieces of paper but it was obvious . . . that they were interrelated parts of a single transaction," the documents are treated as a unitary contract. Gen. Inv. Corp. v. Angelini, 58 N.J. 396, 400 (1971); accord In re Resnick, 284 N.J. Super. 47, 60 (App. Div. 1995) (explaining because decedent's will and its attendant contract refer to one another and are closely related, the two documents "must be read in pari materia"); James Talcott, Inc. v. Roto American Corp., 123 N.J. Super. 183, 210 (Ch. Div. 1973) (stating "a binding contract may be gathered from separate writings where 'the writings are so interrelated that they may be fairly considered to constitute collectively the material and essential elements of the final bargain'"); Sampson v. Pierson, 140 N.J. Eq. 524, 527 (Ch. 1947) (holding "a complete contract . . . may be gathered from letters between the parties relating to the subject-matter and substantive terms, where the writings are so interrelated that they may be fairly considered to constitute collectively the material and essential elements of the final bargain").

The record demonstrates Panaccione purchased the interests of Schibell and Casiero through his nominee, Martin. Panaccione was fully aware of, and helped to orchestrate, the Sales Agreement. Not only was Panaccione present at the execution of the agreement, but he was also the true purchaser. In order to protect themselves during the period while the purchase was pending, the parties also agreed to a Deadlock Agreement, whereby Schibell and Casiero would be designated as Martin's representatives to manage The Den. Thus, the Deadlock Agreement was constructed as a safeguard; the two agreements were dependent on each other. As noted by the trial court, because the two agreements "were executed on the same day, pertain to the control and management of the same company, and contain . . . cross-references, the two agreements" should be considered "part and parcel of the same transaction."

The record amply supports the judge's conclusion that the Sales Agreement and the Deadlock Agreement "were interrelated parts of a single transaction" and should be treated as a unitary contract. Angellini, 58 N.J. at 400. Therefore, Schibell and Casiero are entitled to enforce the arbitration clause.

Alternatively, the trial court held Schibell and Casiero are able to enforce the arbitration provision as third-party beneficiaries or as Martin's agents under the Deadlock Agreement. The record supports these additional bases for enforceability.

Typically a non-party to an agreement lacks standing to compel arbitration of claims. <u>Garfinkel v. Morristown Obstetrics & Gynecology Assoc.</u>, 333 N.J. Super 291, 308 (App. Div. 2000), <u>rev'd on other grounds</u>, 168 N.J. 124 (2001). However, "[n]onsignatories of a contract . . . may compel arbitration or be subject to arbitration if the nonparty is an agent of a party or a third party beneficiary to the contract." <u>Ibid.</u> (first alteration in original) (quoting <u>Mutual Benefit Life Ins. Co. v. Zimmerman</u>, 783 F.Supp. 853, 865-66 (D.N.J.), <u>aff'd</u>, 970 F.2d 899 (3d Cir. 1992)).

We apply the following test to determine whether an individual is a third-party beneficiary of a contract:

> When a court determines the existence of "third-party beneficiary" status, the inquiry "focuses on whether the parties to the contract intended others to benefit from the existence of the contract, or whether the benefit so derived arises merely as an unintended incident of the agreement." <u>Broadway Maint. Corp. v. Rutgers</u>, 90 N.J. 253, 259 (1982); <u>see also</u> <u>Rieder Cmtys. v. Twp. of N. Brunswick</u>, 227 N.J. Super. 214, 222 (App. Div. 1988). As the former Court of Errors and Appeals stated,

> [t]he determining factor as to the rights of a third party beneficiary is the intention of the parties who actually made the contract. They are the persons who agree upon the promises, the covenants, the guarantees; they are the persons who create the rights and obligations which flow from the contract. . . . Thus, the real test is whether the

> contracting parties intended that a third party should receive a benefit which might be enforced in the courts; and the fact that such a benefit exists, or that the third party is named, is merely evidence of this intention.
>
> [<u>Borough of Brooklawn v. Brooklawn Hous. Corp.</u>, 124 N.J.L. 73, 76-77 (E. & A. 1940).]
>
> If there is no intent to recognize the third party's right to contract performance, "then the third person is only an incidental beneficiary, having no contractual standing." <u>Broadway Maint.</u>, 90 N.J. at 259 (citing <u>Standard Gas Power Corp. v. New England Cas. Co.</u>, 90 N.J.L. 570, 573-74 (E. & A. 1917)).
>
> [<u>Ross v. Lowitz</u>, 222 N.J. 494, 513 (2015) (alteration in original).]

Here, Schibell and Casiero agreed to sell their aggregate fifty percent interest in The Den to Pannaccione. Because Pannaccione owned the other fifty percent of The Den, the potential for an impasse existed. In order to both protect their respective interests during the pendency of the sale and to create a mechanism to resolve deadlocks, the parties negotiated and executed the Deadlock Agreement. In case of an impasse or disagreement, Martin would appoint Schibell and Casiero as his nominees under the Deadlock Agreement. Given the purpose of the Deadlock Agreement and Panaccione and Martin's agreement to this assignment of authority in the event of an impasse, Schibell and Casiero are

third-party beneficiaries of the Deadlock Agreement. For this additional reason, they have standing to compel arbitration.

Schibell and Casiero can also compel arbitration under the agency exception. "An agency relationship is created 'when one person (a principal) manifests assent to another person (an agent) that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.'" N.J. Lawyers' Fund for Client Protection v. Stewart Title Guaranty Co., 203 N.J. 208, 220 (2010) (quoting Restatement (Third) Agency, § 101 cmt. f(1) (Am. Law. Inst. 2006). In our prior opinion, we noted there was no evidence Schibell and Casiero, when acting in their capacities as nominees, were subject to Martin's control. However, direct control over an agent by the principal is not necessary to establish an agency relationship. See Sears Mortgage Corp. v. Rose, 134 N.J. 326, 338 (1993). In fact, the principal can be said to still have "control even if the principal has previously agreed with the agent that the principal will not give interim instructions to the agent or will not otherwise interfere in the agent's exercise of discretion." Restatement (Third) Agency, § 101 cmt. f(1).

Martin appointed Schibell and Casiero as his nominees/agents. Because Schibell and Casiero would only act on Martin's behalf, subject to the Deadlock Agreement, albeit within their own

discretion, Schibell and Casiero are deemed to be Martin's agents and subject to the exception whereby nonsignatories may enforce an arbitration provision.

III.

Finally, we address plaintiffs' argument that the trial court erred by sealing the record and deposition transcripts. Plaintiffs contend the trial court made no factual findings or conclusions of law that defendants met the "good cause" standard imposed by Rule 1:38-11(b). Specifically, plaintiffs contend the trial court did not address whether allowing public access to the trial record would cause a "clearly defined and serious injury" to Schibell and that his interest "in privacy substantially outweighs the presumption that all court . . . records are open for public inspection." R. 1:38-11(b).

Plaintiffs further contend the motion to seal the record was procedurally deficient, having been filed nearly two years into the litigation. Plaintiffs allege Schibell violated the order to seal the record by "divulging verbatim a portion of the trial court's March 29, 2017 written opinion" in his April 5, 2017 letter to the owner of the property on which the Sayerville club is

29

located.[5]  Plaintiffs also contend defendants had the trial record sealed for "nefarious reasons."

There is a presumption of public access to documents and materials filed in a civil action.  <u>Hammock by Hammock v. Hoffman-Laroche</u>, 142 N.J. 356, 375 (1995).  The presumption of access may be rebutted by showing "society's interest in secrecy outweighs the need for access."  <u>Spinks v. Twp. of Clinton</u>, 402 N.J. Super. 454, 460 (App. Div. 2008).  However, "[a] personal interest in privacy and freedom from annoyance and harassment, while important to the litigant, will not outweigh the presumption of open judicial proceedings even in relatively uncomplicated and non-notorious civil litigation."  <u>Verni v. Lanzaro</u>, 404 N.J. Super. 16, 24 (App. Div. 2008).

The sealing of documents is "addressed to the trial court's discretion," but "that discretion must be structured."  <u>Hammock</u>, 142 N.J. at 380.  A court must state, with particularity, the facts that "currently persuade the court to seal the document[s]."  <u>Id.</u> at 382.  The court must "examine each document individually and make factual findings" with regard to why the interest in

_____

[5]   The letter stated the trial judge found Pannaccione's "fraudulent allegations untruthful and dismissed his case."  It also disclosed the trial court stated "Pannaccione's testimony was replete with inconsistencies and numerous falsehoods.".

public access is outweighed by the interest in nondisclosure. <u>Keddie v. Rutgers</u>, 148 N.J. 36, 54 (1997).

Here, the judge did not provide a particularized factual basis for sealing the record. He simply stated it is "in the interest of all the parties" because "[t]heir reputations are important." He did not provide any further reasons nor did he include an event-by-event or document-by-document review.

Defendants have not demonstrated sufficient cause for sealing the trial record and deposition transcripts. Their personal interest in privacy does not outweigh the presumption of public access. Accordingly, we reverse the February 28, 2017 order and direct the trial court to unseal the record.

Affirmed in part and reversed in part.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3388-16T2