**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1662-20

NIKKI CORDERO,

     Plaintiff-Appellant,

v.

FITNESS INTERNATIONAL,
LLC, a/k/a LA FITNESS
INTERNATIONAL, LLC,
RYAN FARLEY, LINA
ANDERSON, and GEORGE
WALKER,

     Defendants-Respondents.

_____

Submitted October 18, 2021 – Decided November 10, 2021

Before Judges Vernoia and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-0641-18.

Smith Eibeler, LLC, attorneys for appellant (Christopher J. Eibeler, Meghan Chrisner-Keefe, and Lisa Ackerly Hernandez, on the briefs).

William F. Dahill (Dunnington, Bartholow & Miller, LLP) of the New York bar, admitted pro hac vice, and

Olivera Medenica (Dunnington, Bartholow & Miller, LLP) attorneys for respondents Fitness International, LLC, and Lina Anderson (William F. Dahill and Olivera Medenica, on the brief).

PER CURIAM

Plaintiff Nikki Cordero appeals from the January 12, 2021 Law Division order dismissing her complaint asserting claims under the New Jersey Law Against Discrimination (NJLAD), N.J.S.A. 10:5-1 to -42, quid pro quo sexual harassment, sexual discrimination, and retaliation against defendants Fitness International, LLC, also known as LA Fitness International, LLC, and Lina Anderson (collectively referred to as defendants)[1] and compelling arbitration. For the reasons that follow, we reverse and remand.

I.

This matter comes before us for a second time. The parties are familiar with the procedural history and facts of this case and, therefore, they will not be repeated in detail here.[2] We derive the following facts from the motion record

---

[1] Defendants Ryan Farley and George Walker are not participating in this appeal.

[2] The chronology is set forth in this court's unpublished opinion entered on April 10, 2019, in which we reversed the May 25, 2018 Law Division order, denying defendants' motion to dismiss the complaint and compel arbitration, and the July 20, 2018 order denying their motion for reconsideration. Cordero v. Fitness Int'l, LLC, No. A-5542-17 (App. Div. Apr. 10, 2019) (slip op. at 2-4). We

2                                                                    A-1662-20

on remand. Plaintiff is a former employee of LA Fitness. During her three-month tenure at the Holmdel LA Fitness gym in 2016, plaintiff claims her supervisor, defendant George Walker, the trainees' manager, sexually harassed and assaulted her at work. According to plaintiff, defendants collectively created a hostile work environment and discriminated against her on the basis of her sex, resulting in her termination.

On March 3, 2016, plaintiff applied for an open sales counselor position with LA Fitness's Holmdel gym. She was twenty-two years old at the time and "had recently moved in with [her] mother." Plaintiff claims she applied for the position through an app called "Snagajob" and "attached [her] resume to the app . . . and . . . clicked submit."

Between March 3 and March 9, 2016, plaintiff received an invitation to interview for an open position from defendant Ryan Farley, the general manager at the Holmdel gym. Plaintiff interviewed onsite at the Holmdel gym with Farley and after the interview, she was invited for a second interview that day

<hr>

reversed and remanded for further proceedings and directed the trial court to consider the motion anew and enter a new order, together with a written or oral statement of reasons in conformity with Rule 1:7-4. Id. slip op. at 5. We incorporate, by reference, the facts stated in our prior opinion to the extent they are consistent with those developed on remand.

with Ray Malki.  At the conclusion of the second interview, plaintiff was offered the sales counselor position, which she accepted.

On March 9, 2016, plaintiff began her employment at the Holmdel location.  During her new hire onboarding on her first day of work, plaintiff was seated across from Farley at his desk.  Plaintiff was instructed to "sign a few things electronically . . . to start."  She claimed:

> the signature pad was right in front of me to my left. Like I said, he was sitting across from me looking at the computer and he was basically clicking away . . . I signed a few times just so I was able to start . . . my training for my job . . . .
>
> . . . .
>
> I did not physically see [what I was signing].  He basically just said, you know, in order for me to start, you know, I would have to, you know, sign these employment documents and then we would go on and start our training.  So I signed -- I signed electronically the things that he told me to sign.
>
> . . . .
>
> After I signed all the stuff that he gave me to sign, he invited me to sit on his side of the desk where he was sitting and he pulled up the chair next to me.  And at that point he was basically showing me, you know, all his clients that he -- potential clients that he had that he usually makes phone calls to every day to see if they want a membership. . . .

4

While employed by LA Fitness, plaintiff alleges she repeatedly heard Walker and Farley make sexual comments regarding the Holmdel gym female employees and gym members. On March 27, 2016, plaintiff claims Walker approached her to inquire about her recent manicure while she was working at her desk. Walker then asked her, "Did you get your toes done too?" After responding "No," plaintiff avers Walker then stated, "Let me know when you get your toes done so I can suck them," and she responded, "[N]o thank you." Despite plaintiff's apparent discomfort with Walker's "unwelcomed sexual advance[s]," he "placed his hands on [plaintiff]'s waist from behind" and "grabbed and groped [her] breast." Walker then ostensibly stated "words to the effect of, 'I had a dream last night that I fucked you'" and threatened plaintiff "with words to the effect of[] 'I'm the boss around here! If I didn't like you, you would not be working here!'"

In her Law Division complaint, plaintiff also alleged she heard Walker referring to a female gym member as having a "nice ass and breasts," and stating to Farley, "[D]amn, I'd hit that." Feeling "intimidated by . . . Walker's behavior and comments[,]" plaintiff "changed her work wardrobe to long, baggy-fitting sweaters and other clothes" in order to "draw less attention from . . . Walker."

A-1662-20

After this interaction, plaintiff immediately informed both her direct supervisor, Farley, via text message, and her mother of the incident. Because she felt unsafe, plaintiff went outside the Holmdel gym because no management personnel were inside. Plaintiff's mother then contacted the police, who arrived at the Holmdel gym shortly thereafter to take plaintiff's statement and speak with Walker. Plaintiff left work early that day after being interviewed by the police and felt "tremendous anxiety." Later that day, the police called plaintiff and advised, "Walker had been arrested for criminal sexual contact and that a 'no contact' order had been issued." Plaintiff proceeded to advise Farley of the no contact order.

On March 29, 2016, plaintiff returned to work, where she was informed by Farley that "Walker would be transferred to . . . [another] LA Fitness' gym location." After her meeting with Farley, plaintiff attempted to file an incident report with LA Fitness's human resources manager, defendant Lina Anderson, who "advised [p]laintiff that the operations manager is responsible for filing an incident report[,]" and he should be contacted directly. Plaintiff contacted the operations manager and reported the March 27, 2016 incident to him. An incident report was filed with human resources. Despite her many attempts "to learn the status of her complaint and whether there would be an investigation,"

A-1662-20

plaintiff was never informed about whether defendants took any action in response to her incident report.

On May 10, 2016, plaintiff received a phone call from Anderson and Malki advising she was terminated. According to plaintiff, Anderson stated, "that situation shouldn't have affected your work." Walker then returned to work at the Holmdel gym and allegedly continued his untoward behavior to women. On July 11, 2017, "Walker was charged with criminal sex charges after he allegedly groped a female gym member . . . at the Holmdel [g]ym." On January 26, 2018, plaintiff filed her complaint in the Law Division. As stated in our prior opinion, defendants filed a motion to dismiss the complaint and compel arbitration. We reversed the May 25, 2018 order denying defendants' motion and the July 20, 2018 order denying their motion for reconsideration. On remand, we directed the trial court "to consider the motion anew and enter a new order, together with a written or oral statement of reasons in conformity with Rule 1:7-4."

Following remand, a different trial court was assigned this matter. Consistent with our decision, the trial court permitted "limited discovery" on the issues regarding arbitration and conducted a plenary hearing in order to assess credibility issues. The parties exchanged documents and conducted depositions

7

prior to the hearing. On July 22 and 31, 2020, the trial court held a plenary hearing "for the limited purpose of determining whether or not the parties have entered into a binding enforceable arbitration agreement in relation to [plaintiff's] claims."

Plaintiff and two representatives of LA Fitness testified at the hearing. After the conclusion of the hearing, the trial court allowed post-hearing briefing. On January 11, 2021, the trial court granted defendants' motion to compel arbitration and dismissed plaintiff's complaint without prejudice. In its written eleven-page statement of reasons, the trial court found:

> Plaintiff answered [defendant LA Fitness's] job posting using the website Snagajob. She completed and signed [the] [a]pplication for [e]mployment remotely.
>
> The [a]pplication for [e]mployment included an [a]rbitration and [d]ispute [r]esolution [a]greement . . . . The text instructed her to read and sign the [a]greement "as a condition of consideration for employment with Fitness International . . . ."
>
> . . . .
>
> [The arbitration agreement] contained a block for electronic signature – separate from the signature block for the application itself. There is no dispute that [plaintiff] completed the electronic signature for this [d]ispute [r]esolution [a]greement portion of the application. An electronic notification – referring to an IP address – verifies her use of the electronic signature block from a remote computer.

A-1662-20

. . . .

The [c]ourt finds, on the basis of the evidence now before it, that . . . [p]laintiff freely assented to the [d]ispute [r]esolution [a]greement . . . when she was presented with and signed the same in connection with the [a]pplication for [e]mployment. The record is undisputed that a complete form of the [d]ispute [r]esolution [a]greement was contained within the [a]pplication for [e]mployment; that [plaintiff] executed the electronic signature – separately from the application itself – signifying her assent to its terms; and the [a]greement itself not only advised her of the right to seek counsel, but afforded her an opportunity to reject the [a]greement and withdraw her application.

. . . .

For these reasons, the [c]ourt finds the [d]ispute [r]esolution [a]greement is an enforceable contract, binding on [plaintiff] and applicable to the claims asserted in her action. There has never been an issue presented in this case concerning whether the terms of such agreement are sufficiently clear to give rise to an enforceable waiver of the right to proceed in a court.

A memorializing order was entered. This appeal ensued.

On appeal, plaintiff presents the following arguments for our consideration:

POINT I: [PLAINTIFF] DID NOT KNOWINGLY AND VOLUNTARILY AGREE TO WAIVE HER STATUTORY RIGHT TO A JURY TRIAL.

A. The Employment Application [I]s Not [A] Contract.

9                                                    A-1662-20

B. The Arbitration Agreement [I]s Not [A] Stand-Alone Contract.

C. Appellant Did Not Knowingly [A]nd Voluntarily Waive Her Right [T]o Sue.

D. The Court Declined [T]o Analyze Whether [T]he Documents Signed During [Plaintiff's] [Onboarding] Were Binding.

POINT II: [PLAINTIFF] DID NOT WAIVE HER RIGHT TO A JURY TRIAL ON CLAIMS FOR INJUNCTIVE RELIEF UNDER THE [NJ]LAD.

II.

Orders compelling or denying arbitration are treated as final orders for purposes of appeal. R. 2:2-3(3); GMAC v. Pittella, 205 N.J. 572, 582 n.6 (2011). The validity of an arbitration agreement is a question of law. Atalese v. U.S. Legal Servs. Grp., L.P., 219 N.J. 430, 446 (2014) (citing Hirsch v. Amper Fin. Servs., LLC, 215 N.J. 174, 186 (2013)). Accordingly, the appellate court applies a de novo standard of review when determining the enforceability of arbitration agreements. Goffe v. Foulke Mgmt. Corp., 238 N.J. 191, 207 (2019) (citing Hirsch, 215 N.J. at 186). As such, we "need not give deference to the analysis by the trial court." Ibid. However, a trial court's factual findings are reviewed for an abuse of discretion. See Cumberland Farms, Inc. v. N.J. Dep't of Env't. Prot., 447 N.J. Super. 423, 437-38 (App. Div. 2016). "The general rule is that

10

findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Ibid. (quoting Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011)).

Both the Federal and the New Jersey Legislatures have "enunciate[d] federal and state policies favoring arbitration." Atalese, 219 N.J. at 440 (citations omitted); see also Martindale v. Sandvik, Inc., 173 N.J. 76, 92 (2002) ("[T]he affirmative policy of this State, both legislative and judicial, favors arbitration as a mechanism of resolving disputes." (citing Barcon Assocs., Inc. v. Tri-Cnty. Asphalt Corp., 86 N.J. 179, 186 (1981))).

The Federal Arbitration Act (FAA), 9 U.S.C.A. § 1 -307, requires "courts [to] place arbitration agreements on equal footing with all other contracts." Skuse v. Pfizer, Inc., 244 N.J. 30, 47 (2020) (internal quotation marks omitted) (quoting Kindred Nursing Ctrs. Ltd. P'ship v. Clark, 581 U.S. ___, 137 S. Ct. 1421, 1424 (2017)). Under the FAA, a state "may not 'subject an arbitration agreement to more burdensome requirements than those governing the formation of other contracts,'" or invalidate the agreement through "state -law 'defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue.'" Ibid. (first quoting Leodori v. CIGNA Corp., 175 N.J. 293, 302 (2003)); and then quoting Atalese, 219 N.J. at 441). The FAA,

11

however, does not bar all state-law defenses and "specifically permits states to regulate contracts, including contracts containing arbitration agreements under general contract principles." Ibid. (quoting Martindale, 173 N.J. at 85).

Similarly, the New Jersey Legislature codified its own endorsement of arbitration agreements in the New Jersey Arbitration Act (NJAA), N.J.S.A. 2A:23B-1 to -36. See Hojnowski v. Vans Skate Park, 187 N.J. 323, 342 (2006). The statute was enacted to "advance arbitration as a desirable alternative to litigation and to clarify arbitration procedures in light of the developments of the law in this area," Assemb. Judiciary Comm. Statement to S. 514 1 (Dec. 9, 2002), and "is nearly identical to the FAA," Arafa v. Health Express Corp., 243 N.J. 147, 167 (2020) (citing Atalese, 219 N.J. at 440). The NJAA provides that "[a]n agreement contained in a record to submit to arbitration any existing or subsequent controversy arising between the parties to the agreement is valid, enforceable, and irrevocable except upon a ground that exists at law or in equity for the revocation of a contract." N.J.S.A. 2A:23B-6(a).

Consequently, New Jersey courts "may 'regulate [arbitration] agreements, including those that relate to arbitration, by applying its contract-law principles that are relevant in a given case.'" Skuse, 244 N.J. at 47 (quoting Leodori, 175 N.J. at 302). When reviewing a motion to compel arbitration, courts apply a

two-pronged inquiry: (A) whether there is a valid and enforceable agreement to arbitrate disputes; and (B) whether the dispute falls within the scope of the agreement. Martindale, 173 N.J. at 83, 92.

Plaintiff here contends the arbitration agreement is not a valid and enforceable contract because the agreement: (1) was not "in writing"; (2) was not divisible from the employment application, which is not a contract per the application's disclaimer; and (3) was executed without her knowing and voluntary consent. First, plaintiff argues that defendants conditioned the agreement to "require such a document to be executed[] 'in writing.'"

"I understand that . . . this document . . . [does not] constitute[] an employment contract unless a specific document to that effect is executed by both the employer and myself, in writing." (emphasis added). Plaintiff specifically notes that the employment application was "online only, . . . not in a document[,] . . . [defendant Bryant's] electronic signature . . . was inserted[,] [and] . . . [plaintiff] never signed the employment application in writing."

We analyze the term "in writing" in the context of the agreement under review. A "writing" is "[a]ny intentional recording of words in a visual form, whether in handwriting, printing, typewriting, or any other tangible form . . . includ[ing] hard-copy documents, electronic documents on computer media,

audio and videotapes, e-mails, and any other media on which words can be recorded." Writing, Black's Law Dictionary (11th ed. 2019).

Our Supreme Court has routinely upheld the use of electronic documents and signatures to uphold a contract. See Skuse, 244 N.J. at 55 n.2 ("[E]lectronic . . . agreements are considered to be writings because they are printable and storable." (quoting Feldman v. Google, Inc., 513 F. Supp. 2d 229, 236 (E.D. Pa. 2007))); Shelton v. Restaurant.com, Inc., 214 N.J. 419, 439 (2013) (rejecting the argument that an electronic, consumer contract between parties cannot be considered a contract because it was not "in writing," pursuant to the Plain Language Act, N.J.S.A. 56:12-1 to -13); Caspi v. Microsoft Network, L.L.C., 323 N.J. Super. 118, 125 (App. Div. 1999) ("[E]lectronic versus printed[,] . . . in any sense that matters, there is no significant distinction."); see also N.J.S.A. 12A:12-7(a) (stating an electronic consumer contract or signature may not "be denied legal effect or enforceability solely because it is in electronic form"). 15 U.S.C.A. § 7001(a) ("[A] signature, contract, or other record relating to [a] transaction may not be denied legal effect, validity, or enforceability solely because it is in electronic form[] [or] . . . because an electronic signature or electronic record was used in its formation.").

Here, the fact the application was available online, included an electronic signature, and was never physically signed by plaintiff, permits only a conclusion that the arbitration agreement constituted an "intentional recording of words in a visual form," i.e., "in writing." Writing, Black's Law Dictionary (11th ed. 2019).

Second, plaintiff argues the trial court erred in its "factual finding that the [a]rbitration [a]greement was 'contained within the [a]pplication for [e]mployment'" but was divisible from the application for purposes of enforcing the agreement's arbitration provisions. An employer may not assert "its written rules and regulations were not contractual and then argue, through reference to the same materials, that the employee contracted away a particular right." Morgan v. Raymours Furniture Co., 443 N.J. Super. 338, 342-43 (App. Div. 2016).

In Woolley v. Hoffman-La Roche, Inc., our Supreme Court held that a company manual "impos[es] an obligation on the employer to abide by the terms of [its] [employee] manual." Wade v. Kessler Inst., 172 N.J. 327, 340 (2002) (citing Woolley, 99 N.J. 284, 292 (1995)). Employers, however, may avoid such obligations by including in its manuals "a prominent disclaimer of the contractual nature of a handbook." Morgan, 443 N.J. Super. at 342.

A-1662-20

But an employer may not "seek both the benefit of its disclaimer . . . while insisting that [its materials were] contractual when it suits its purposes." Ibid. (citation omitted). In Morgan, where the plaintiff was terminated after refusing to sign a stand-alone arbitration agreement, we determined the prominent disclaimer included in the employee handbook precluded enforcement of the arbitration agreement contained in the same handbook. 433 N.J. Super. at 343. "By inserting such a waiver provision in a company handbook, which, at the time, the employer insisted was not 'promissory or contractual,' an employer cannot expect—and a court, in good conscience, will not conclude—that the employee clearly and unambiguously agreed to waive the valued right to sue." Ibid. However, a stand-alone arbitration agreement will be enforced by the court. Id. at 344.

Plaintiff, relying on our decision in Morgan, where the disclaimer included in the employee handbook precluded enforcement of the unsigned arbitration agreement included in same, asserts the disclaimer within defendants' employment application disclaimed the application's arbitration agreement. "[A]n arbitration agreement is unenforceable when it is contained in a document that disclaims [it] is a contract." Plaintiff relies on the fact that the trial court

16

itself recognized that the arbitration agreement was in fact included in the employment application.[3]

However, our Supreme Court has previously held an arbitration agreement contained within an employment application is a stand-alone contract. In Martindale, where the plaintiff argued an arbitration agreement contained within an employment application to be unenforceable because the agreement was not an employment contract, the Supreme Court held an arbitration "agreement is complete in and of itself and need not be part of a larger employment contract." 173 N.J. at 86. "[T]he question of enforceability is determined not on the basis of whether the arbitration agreement is contained in an application for employment or in an employment contract, but rather whether the arbitration provision qualifies as a valid and enforceable contract." Id. at 87.

Here, the trial court found the agreement, standing on its own, to be a valid and enforceable contract and noted the agreement had its own separate and distinct block for electronic signatures. Importantly, unlike in Morgan, where

_____

[3] Although the trial court did in fact recognize the agreement was contained within in the application for employment, it distinguished the application's disclaimer from that in Morgan, determining the disclaimer in Morgan to have been broader than defendant's arbitration agreement, "contain[ing] language to the effect that the entire contents of the document did not give rise to an enforceable employment contract."

A-1662-20

the employee's signature "only established that the employee had received a copy of the same and did not evidence agreement to any of its terms," plaintiff's signature here ostensibly established both receipt of the agreement as well as her agreement with its terms. Thus, plaintiff's consent to the agreement is distinct and separate from that of the disclaimer. Because the trial court found the agreement was a stand-alone arbitration agreement, and thus not limited by the application's disclaimer, the sole "question of [its] enforceability is determined . . . [by] whether the arbitration provision qualifies [on its own] as a valid and enforceable contract." Martindale, 173 N.J. at 87.

Third, plaintiff argues the arbitration agreement itself is not a valid contract because it was executed without her knowledge or consent. Only the trial court, and not the arbitrator, may determine whether a valid arbitration agreement in fact exists. See Martindale, 173 N.J. at 83. An arbitrator is not empowered to decide disputes related to the parties' agreement "unless and until the trial court initially resolves the issues of fact pertaining to the formation of the arbitration provision, and determines the parties agreed to arbitrate their claims." Knight v. Vivint Solar Dev., LLC, 465 N.J. Super. 416, 428 (App. Div. 2020), cert. denied, 246 N.J. 222 (2021), and cert. denied, 246 N.J. 223 (2021). Under our State's defined contract-law principles, a valid and enforceable

18

agreement requires: (1) consideration;[4] (2) a meeting of the minds; and (3) unambiguous consent. See Atalese, 219 N.J. at 442-45. Additionally, if the arbitration agreement is a contract of adhesion, the court will not enforce the agreement if the agreement is unconscionable.[5] Vitale v. Schering-Plough Corp., 447 N.J. Super. 98, 111 (App. Div. 2016).

An arbitration agreement, like any other contract, requires a meeting of the minds. A meeting of the minds, i.e., mutual assent, requires the parties to have both: (1) reasonable notice of the agreement, See Hoffman v. Supplements Togo Mgmt., LLC, 419 N.J. Super. 596, 607 (App. Div. 2011); and (2) "an understanding of the terms to which they have agreed," Atalese, 219 N.J. at 442.

---

[4] Our Supreme Court has held "that the creation of an employment relationship, which is achieved when the employer agrees to consider and/or agrees to hire the applicant for employment, is sufficient consideration to uphold an arbitration agreement contained in an employment application." Martindale, 173 N.J. at 88 (citations omitted) (finding defendants' consideration of plaintiff's application to be adequate consideration).

[5] "Whether an employment provision is enforceable depends on an analysis of the subject of the provision, the sophistication of the employee, and whether the employee has some bargaining power." Vitale, 447 N.J. Super. at 111 (citing Martindale, 173 N.J. at 90). Generally, an arbitration agreement for employment is enforceable because "[a]lthough the parties were in an unequal bargaining position, [applicants] [are] entitled to reject the disclaimer and seek employment elsewhere." Ibid. As such, courts will generally only find an arbitration agreement unenforceable if the agreement violates public policy. Ibid.

An arbitration agreement "is not enforceable unless the [parties] ha[ve] reasonable notice of its existence." Wollen v. Gulf Stream Restoration & Cleaning, LLC, __ N.J. Super. ___, ___ (App. Div. July 9, 2021) (slip op. at 19) (citing Hoffman, 419 N.J. Super. at 609). A party does not have a reasonable notice of an arbitration agreement where the agreement is "proffered unfairly[] or . . . design[ed] to conceal or de-emphasize its provisions" through the application's "style[,] . . . mode of presentation, or the placement of the [agreement]." Skuse, 244 N.J. at 55 (citing Caspi, 323 N.J. Super. at 125).

If a party has reasonable notice of an arbitration agreement, the party may not claim a lack of notice for failure to read it. "[A]s a general rule, 'one who does not choose to read a contract before signing it cannot later relieve himself of its burdens.'" Skuse, 244 N.J. at 54 (quoting Riverside Chiropractic Grp. v. Mercury Ins. Co., 404 N.J. Super. 228, 238 (App. Div. 2008); see also Goffe, 238 N.J. at 212 ("[T]he argument that [a] plaintiff did not understand the import of the arbitration agreement and did not have it explained to her by the [employer] is simply inadequate to avoid enforcement of [the] clear and conspicuous arbitration agreement[ ] that [she] signed." (citing Borough of E. Caldwell v. Borough of Caldwell, 26 N.J. 9, 24-25 (1958)))).

We have recognized that electronic or online "contracts are no longer a novel concept." Wollen, __ N.J. Super. at __ (slip op. at 14). The enforceability of an electronic contract "often turns on whether the agreement is characterized as a 'scrollwrap,' 'sign-in wrap,' 'clickwrap,' or 'browsewrap' – or a hybrid version of these electronic contract types." Id. at __ (slip op. at 15) (citing Berkson v. Gogo LLC, 97 F. Supp. 3d 359, 394-401 (E.D.N.Y. 2015)); see also ibid. (defining the online contract characterizations). But regardless of the contract's characterization, "the pertinent inquiry is whether the user was provided with reasonable notice of the applicable terms, based on the design and layout of the [application]." Id. at ___ (slip op. at 17). "In that regard, [electronic] contracts are not all that different from traditional, written contracts containing arbitration provisions." Ibid.

A "scrollwrap" agreement is generally sufficient to show reasonable notice. A "scrollwrap" agreement requires "users to physically scroll through an [electronic] agreement and click on a sperate 'I agree' button in order to assent to the terms and conditions of the [application]." Id. at ___ (slip op. at 15) (quoting Berkson, 97 F. Supp. 3d at 394-401). In Caspi, where prospective subscribers had to view multiple computer screens of information, including a membership agreement with a forum selection clause, and registration could

only proceed after the prospective subscriber clicked "I Agree" after having the opportunity to scroll through view the full membership agreement, the appellate court held the plaintiffs had reasonable notice. 323 N.J. Super. at 122, 125. Here, defendants' application and arbitration agreement consisted of a "scrollwrap" agreement. As such, plaintiff should have had reasonable knowledge of the agreement as required to constitute a meeting of the minds. An arbitration agreement, like any other contract, requires a meeting of the minds. A meeting of the minds, i.e., "[m]utual assent[,] requires that the parties have an understanding of the terms to which they have agreed." Atalese, 219 N.J. at 442.

Because an arbitration agreement waives a constitutional right, "the right to pursue a case in a judicial forum, 'courts take particular care in assuring the knowing assent of both parties to arbitrate, and a clear mutual understanding of the ramifications of that assent.'" Atalese, 219 N.J. at 442-43 (quoting NAACP of Camden Cnty. E. v. Foulke Mgmt. Corp., 421 N.J. Super. 404, 425 (App. Div. 2011)). "The point is to assure that the parties know that in electing arbitration as the exclusive remedy, they are waiving their time-honored right to sue." Marchak v. Claridge Commons, Inc., 134 N.J. 275, 282 (1993). As such, to show mutual assent to arbitrate, the terms must "be sufficiently clear to place

[an individual] on notice that he or she is waiving a constitutional or statutory right." Atalese, 219 N.J. at 443.

When analyzing the validity of an arbitration agreement, there are "no prescribed set of words [that] must be included . . . to accomplish a waiver of rights." Atalese, 219 N.J. at 447. "No particular form of words is necessary to accomplish a clear and unambiguous waiver of rights." Id. at 444. If "at least in some general and sufficiently broad way" the language of the clause conveys that arbitration is a waiver of the right to bring suit in a judicial forum, the clause will be enforced. Id. at 447; see Arafa, 243 N.J. at 172 (finding waiver "was knowing and voluntary in light of the . . . broad agreement to resolve 'all disputes' between the parties through binding arbitration"). In the employment setting in particular, an arbitration "provision must reflect that an employee has agreed clearly and unambiguously to arbitrate the disputed claim." Leodori, 175 N.J. at 302.

Here, the terms of the agreement appear to be clear and unambiguous:

> This [d]ispute [r]esolution [a]greement and the [d]ispute [r]esolution [r]ules and [p]rocedures affect your legal rights. You may wish to seek legal advice before signing this . . . [a]greement.
>
> . . . .

I AGREE AND ACKNOWLEDGE RECEIPT OF THE DISPUTE RESOLUTION RULES AND PROCEDURES.

I AGREE THAT I WILL RESOLVE ANY AND ALL CLAIMS OR CONTROVERSIES BETWEEN ME AND [DEFENDANTS] EXCLUSIVELY BY FINAL AND BINDING ARBITRATION IN MY INDIVIDUAL CAPACITY BEFORE A NEUTRAL ARBITRATOR INSTEAD OF ANY COURT ACTION OR JURY TRIAL WHICH I HEREBY EXPRESSLY FOREVER GIVE UP.

However, the party seeking to enforce an arbitration agreement must prove the nonmoving party knowingly and voluntarily assented to it. See Atalese, 219 N.J. at 447 (quoting Garfinkel v. Morristown Obstetrics & Gynecology Assocs., 168 N.J. 124, 135 (2001)); Midland Funding LLC v. Bordeaux, 447 N.J. Super. 330, 336 (App. Div. 2016). Assent requires "some concrete manifestation of the [party's] intent as reflected in the text of the agreement itself." Leodori, 175 N.J. at 300 (quoting Garfinkel, 168 N.J. at 135). "[A] valid waiver results only from an explicit, affirmative agreement that unmistakably reflects the employee's assent." Id. at 303 (citing Garfinkel, 168 N.J. at 135 (instructing when asked to enforce an arbitration agreement, "[t]he [c]ourt [may] not assume that employees intend to waive [their] rights")).

Although a party's signature is "not strictly required, a party's signature to an agreement is the customary and perhaps surest indication of assent." Id. at

24                                                                      A-1662-20

306-07; see id. at 305 ("When one party . . . presents a contract for signature to another party, the omission of that other party's signature is a significant factor in determining whether the two parties mutually have reached an agreement."). Absent a signature, the party seeking to enforce an arbitration agreement must provide some other explicit or unmistakable "indication that the employee affirmatively had agreed to" and "intended to abide by th[e] [arbitration] provision." Id. at 305, 307. "Finding no such proof, [the court] must hold for plaintiff." Id. at 307.

A virtual signature is not an unmistakable indication of consent where the employee denies having signed the agreement. In Knight, the plaintiff asserted defendant had "neither displayed the [arbitration] provision nor explained its legal ramifications to her at any time." 465 N.J. Super. at 427. More importantly, she denied "checking any boxes on [defendant's] [application], including the box, which would otherwise indicate her assent to be bound by the terms of an arbitration provision." Ibid. We noted the importance of plaintiff's assertion, "from the outset of the litigation . . . that she never checked any boxes on the [application], including the arbitration provision" and defendant's failure to have "provided plaintiff with an electronic or hard copy of the [agreement] at any time." Id. at 427-28. Because "the trial court specifically noted there existed

25                                                                    A-1662-20

'a factual issue' as to whether plaintiff checked the arbitration box," we concluded the plaintiff had "not 'sign[ed]' the arbitration agreement." Id. at 427.

Here, the trial court held "[t]he record is undisputed that . . . [plaintiff] executed the electronic signature . . . signifying her assent to its terms." In finding the record uncontroverted, the trial court relied primarily on the IP address[6] attached to the agreement's electronic signature, which "verifie[d] [plaintiff's] use of the electronic signature block from a remote computer." The court also gave considerable weight to the testimony of Mimi Stokesberry, the Vice President of Human Resources for LA Fitness, who developed the application and onboarding process.

At the hearing, Stokesberry testified that in order to apply for a position at LA Fitness, "[t]he applicant would go to our public website," could apply "[f]rom any computer . . . [and] [or] even do it from their phone." After the applicant submits the application, "the[] [application] fills in the date and . . . shows [defendants'] the IP address from which [the application] was executed." When asked how she knew the IP address listed on plaintiff's application was

---

[6] An IP address "acts like a literal address." Digital 101: What is an IP address and what does it mean?, LEADFORENSICS, https://www.leadforensics.com/ digital-101-what-is-an-ip-address-and-what-does-it-mean/ (last reviewed Oct. 26, 2021). "Every online action involves an exchange of IP addresses." Ibid.

not one of defendants' addresses, Stokesberry responded, "Because ours all start with [ten]."

Based on the proofs, there is no dispute that defendants' application contains plaintiff's name, personal information, and typed signature, i.e., her name typed "exactly the way it was typed in at the beginning of the application." "Stokesb[erry] testified this is the only application and it was the one used to hire [plaintiff], and there's no dispute that [the application] was filled out outside of LA Fitness." Saliently, defendants did not suggest that there was no dispute "[plaintiff] executed the electronic signature . . . signifying her assent to its terms."

Notwithstanding the documentary evidence, throughout her testimony at the hearing, plaintiff consistently disputed the fact that she completed defendants' application:

> Yes, it's my information, but I didn't put it there.
>
> . . . .
>
> I submitted [my] resume through Snagajob.
>
> . . . .
>
> I don't know [who put down, "Radius will travel to work [ten] miles"].
>
> . . . .

I don't know [if somebody made it up].

. . . .

It's not accurate [that I have a high school diploma or GED].

. . . .

I didn't [supply that information].

. . . .

[The information under "Reasons for leaving" was] on my resume.

. . . .

I do not know [how information about an interest in club staff got into the application].

. . . .

I do not know [how that information could have been inputted in here].

When asked whether she was aware if someone else filled out the defendants' application on her behalf, plaintiff responded she was unaware. Rather, plaintiff consistently asserted she had not applied for the position through defendants' website, but rather applied on a separate app. And, plaintiff claimed she applied for the position "on [her] telephone . . . [on] an app that [she] downloaded," "called Snagajob." According to plaintiff:

A-1662-20

> Snagajob . . . is basically an app that you download and it has many different employment opportunities and many different jobs, whatever category you want. You just put what you're looking for and a whole bunch of jobs come up and you're able to click on it and you're able to apply for it.

After downloading Snagajob, plaintiff claims she "started submitting applications to many different jobs and . . . places[,] [and] came across LA Fitness. So [she] attached [her] resume to the app . . . and . . . clicked submit and . . . submitted [her] resume to whoever posted the job." After considering plaintiff's testimony, the trial court found she had "answered [defendants'] job posting using . . . Snagajob," even though this fact was not included in plaintiff's certification in opposition to defendant's motion.

Stokesberry admitted she was unaware of Snagajob. Although Stokesberry denied an applicant could use any other "website" to apply for a LA Fitness position, she acknowledged it was possible that the Holmdel gym could have advertised on Snagajob. She stated, "I don't know if managers out there are doing their own thing." Stokesberry claimed to "know that . . . VP's advertise, indeed we've given them the verbiage to use." Moreover, Stokesberry testified that the LA Fitness contract does not create a binding contract between the applicant and LA Fitness, and Stokesberry had even seen ads on Craigslist, which, when brought to her attention, were requested to be taken down.

29

At the hearing, Farley testified that during the onboarding process, plaintiff sat across from his desk, the computer screen was facing him, and out of her sight. Farley also stated that plaintiff signed her name on an electronic signature pad, but he also admitted he had no independent recollection of plaintiff or her onboarding process—he simply testified as to his "general practices."

Based on our review of the record developed during the plenary hearing, we are constrained to reverse and remand this matter because we conclude there is a factual issue as to whether plaintiff typed the electronic signature. Knight, 465 N.J. Super. at 427. The circumstances surrounding plaintiff's execution of the agreement is subject to conflicting interpretations based upon the record before us and does not present a clear expression of an explicit and voluntary agreement to forego the court system and be bound by arbitration and requires further factual findings by the trial court.

Moreover, the disclaimer states that "neither this document," which includes the putative arbitration agreement, "nor any offer of employment from the employer constitutes an employment contract unless a specific document to that effect is executed by both the employer and myself." (Emphasis added). Thus, the application itself suggests that binding contractual obligations would

be set forth in a separate "specific document" setting forth its terms, and, also declares that the application is not a binding contract. The Woolley disclaimer is unclear; it does not carve out the arbitration agreement from its disavowal of the application as a contract. For that reason, the disclaimer could be construed as ambiguous and misleading and, as a result, it could not be reasonably concluded plaintiff knowingly consented to a binding contractual obligation to arbitrate her claims.

On remand, because the trial court did not address whether the onboarding arbitration agreement allegedly signed without plaintiff's opportunity for review was a valid and binding contract, the trial court must make findings of fact and conclusions of law on the issues pertaining to the formation of the second arbitration provision before an arbitrator may be empowered to decide disputes related to the parties' agreement.

### III.

Finally, plaintiff contends she did not waive her right to a jury trial on claims for injunctive relief under the NJLAD. Here, defendant's agreement includes "claims under federal, state and local statutory or common law, such as . . . the law of contract and law of tort." Plaintiff claims the arbitration agreement's language "provide[s] an express exception for 'claims by either

31

party for injunctive relief <u>pending arbitration</u> as provided <u>by applicable state law.</u>'" (emphasis added). No specific, applicable State law has been advanced by plaintiff—rather, her claim for injunctive relief appears to stem from the NJLAD's "overarching goal" to "eradicate[e] . . . the cancer of discrimination." (citing <u>Fuchilla v. Layman</u>, 109 NJ. 319, 334-35 (1988)). And, plaintiff argues under a plain reading, the arbitration agreement functionally requires that "claims by either party for injunctive relief" carve the entire claim from arbitration as it relates to liability and injunctive relief pending arbitration of the monetary damages.

In contrast, defendants contend that the applicable state law is N.J.S.A. 2A:23B-8(b)(2), which states "[a]fter an arbitrator is appointed and is authorized and able to act . . . a party to an arbitration proceeding may move the court for a provisional remedy only if the matter is urgent and the arbitrator is not able to act timely or the arbitrator cannot provide an adequate remedy." Here, because defendants allowed Walker to return to the Holmdel location after her employment ended, plaintiff seeks "injunctive relief to protect the rights of other victims of harassment." We note that plaintiff asserts this claim without having established defendants' liability under the NJLAD or other statutory or common law or identifying the individuals she deems need protection from harassment.

The trial court determined the provision on which plaintiff "relies does not exempt from the [d]ispute [r]esolution [a]greement all claims for injunctive relief that may be afforded a litigant under applicable law" and "is simply not the injunctive relief [plaintiff] seeks in her lawsuit." On remand, the trial court may reconsider its decision after considering any additional evidence.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1662-20